902 A.2d 238

EDWARD JOHNSON, GENERAL ADMINISTRATOR AD PROSE-QUENDUM OF THE ESTATE OF ANN JOHNSON AND EDWARD JOHNSON, INDIVIDUALLY, PLAINTIFF–APPELLANT, v. JOSEPH DOBROSKY, M.D., WEST JERSEY HEALTH SYSTEMS, HOWARD WINTER, M.D. AND SURGICAL ASSOCIATES CHARTERED, DEFENDANTS–RESPONDENTS, AND JOHN DOE(S) A–Z, (FICTITIOUS NAMES AS PERSON(S) AND/OR TREATING PHYSICIANS(S)) AND SUSAN ENDEL, R.N., DEFENDANTS.

Argued March 7, 2006—Decided July 25, 2006.

596

*Gary D. Ginsberg,* argued the cause for appellant (*Ginsberg & O'Connor,* attorneys; *Adam M. Raditz,* of counsel and on the brief).

*Jay J. Blumberg,* argued the cause for respondent Joseph Dobrosky, M.D. (*Blumberg and Lindner,* attorneys; *Charles B. Austermuhl,* on the letter brief).

*Stacy L. Moore, Jr.,* argued the cause for respondent West Jersey Health Systems (*Parker McCay,* attorneys).

*Sharon K. Galpern,* argued the cause for respondents Howard Winter, M.D. and Surgical Associates Chartered (*Stahl & DeLaurentis,* attorneys).

Justice LONG delivered the opinion of the Court.

In 2002, plaintiff, Edward Johnson, individually and in his capacity as the general administrator *ad prosequendum* of the estate of his wife, Ann Johnson, filed a medical malpractice action against defendants Drs. Joseph Dobrosky and Howard Winter, among others. A jury concluded that neither Dr. Dobrosky nor Dr. Winter deviated from the standard of care in their treatment of Mrs. Johnson and returned a judgment of no cause for action.

Plaintiff appealed, challenging, among other things, the introduction into evidence of Mrs. Johnson's prior conviction for welfare fraud. The Appellate Division affirmed and we granted certification limited to that issue. 185 *N.J.* 268, 883 *A.2d* 1064 (2005).

We hold that the trial judge erred in determining that a decedent's "character" is generally in issue in a wrongful death case. As in any personal injury action, a decedent's "character" is not in issue in a wrongful death action except insofar as it is an element of a particular claim or defense. *See N.J.R.E.* 404(c). Where damages for the loss of advice, guidance and counsel described in *Green v. Bittner,* 85 *N.J.* 1, 424 *A.2d* 210 (1980), are alleged, the physical, mental, and moral characteristics of the decedent are admissible only as they bear on the likelihood and extent of such contributions. Here, Mrs. Johnson's conviction for welfare fraud was offered to prove her bad character and was not related to the likelihood of her rendering future advice, guidance

and counsel to her family or the extent of those contributions. Accordingly, its admission was error.

I

On the evening of December 11, 1997, Mrs. Johnson began experiencing stomach pains. Unimproved by the next morning, she summoned an ambulance and traveled to West Jersey Hospital at approximately 10:00 a.m., accompanied by her son Kevin.[1]

Mrs. Johnson arrived at the hospital emergency room at 10:07 a.m. and was first examined by Dr. Joseph Dobrosky, the emergency room physician on duty, at 10:40 a.m. Mrs. Johnson presented with diffuse abdominal tenderness and had a pulse of 56 and a blood pressure reading of 101/44. Dr. Dobrosky ordered blood tests, x-rays and the administration of anti-inflammatory medication. He also requested Mrs. Johnson's chart from a previous admission to the emergency room.

At approximately 1:10 p.m., the test results that were ordered at 10:40 a.m. (morning test results) were available to Dr. Dobrosky. The morning test results indicated that Mrs. Johnson's hemoglobin level was 9.5 [2] and her hematocrit level was 27.8 [3]-both indicating a low blood count. By 1:30 p.m., Mrs. Johnson's blood pressure had fallen 40 systolic points to a level of 61/44 and she had become hypotensive, that is, suffering from abnormally low blood pressure. In response, Dr. Dobrosky ordered the administration of intravenous fluids "open wide" in an effort to "get her

---

[1] Plaintiff had left the house for a job interview earlier that morning and did not accompany Mrs. Johnson to the hospital.

[2] Hemoglobin is a protein that carries oxygen from the lungs to the body's tissues. *Stedman's Medical Dictionary* (5th Lawyer's ed. 1982). Trial testimony indicated that a normal hemoglobin level for a female ranges from approximately 12 to 15.

[3] Hematocrit is the ratio of the volume of red blood cells to the volume of whole blood. *Webster's Dictionary* (3d Int'l ed. 1982). Trial testimony indicated that a normal hematocrit level for a female ranges from approximately 36 to 44.

blood pressure back up." Mrs. Johnson's blood pressure then rose to a normal level.

At 2:00 p.m., Dr. Dobrosky obtained Mrs. Johnson's charts from a previous emergency room visit where her blood pressure had been taken twice and measured 141/78 and 153/84. Dr. Dobrosky then consulted with Mrs. Johnson's family doctor regarding her admission to the hospital and, at approximately 3:00 p.m., called an internist, Dr. Ross, who was to be Mrs. Johnson's admitting physician. Dr. Ross and Dr. Dobrosky decided to contact Dr. Winter, a general surgeon, to request a surgical consult.

By around 3:30 p.m., Mrs. Johnson's abdomen had become distended, indicating increased fluid accumulation, and she continued to complain of abdominal pain. Her blood pressure at that time was 112/47. At 3:45 p.m., her blood pressure fell to 80/52 and she complained of severe abdominal pain. Dr. Dobrosky then ordered additional tests and received the results sometime before 4:30 p.m. Those test results (afternoon test results) showed that Mrs. Johnson's hemoglobin level had dropped to 6.4 and her hematocrit level to 18.7. During that same time period, Dr. Dobrosky ordered one unit of type "O" blood be infused into Mrs. Johnson over four hours. Although his records were to the contrary, Dr. Dobrosky testified at trial that he had ordered that action based on the morning tests results, and admitted that that transfusion rate would have been too slow if ordered based on the afternoon test results. His expert testified, however, that the four-hour transfusion rate did not deviate from the required standard of care regardless of the circumstances.

At 4:45 p.m., Dr. Ross arrived and evaluated Mrs. Johnson. Her blood pressure was then 129/76. At 5:00 p.m., she began sweating and became agitated. Her heart rate increased to 110, nearly double her rate upon admission. By 5:15 p.m. she had become short of breath and was breathing rapidly.

Dr. Winter arrived at the unit some time between 5:00 p.m. and 5:20 p.m. He made a note in Mrs. Johnson's chart stating that he was "called 45 min. ago." At trial, Dr. Winter maintained that

despite Dr. Dobrosky's testimony to the contrary, Dr. Dobrosky did not make the initial call to him at 3:30 p.m. nor did he make subsequent follow-up calls. Dr. Winter examined Mrs. Johnson and discovered that she had an abnormally low blood pressure of 70/50. Her pulse was rapid, she was disoriented, and her abdomen was tender all over. Dr. Winter's initial impression was that Mrs. Johnson was in shock, "almost certainly" due to bleeding in her abdomen. Dr. Winter planned to resuscitate Mrs. Johnson by first administering fluids and blood and then performing surgery.

At 5:30 p.m., Mrs. Johnson coded, or completely lost her vital signs, and Dr. Dobrosky resuscitated her. She was then intubated. At 6:30 p.m., she was taken to the operating room where emergency surgery was performed to stop the internal bleeding. Dr. Winter's pre-operative diagnosis was interabdominal bleeding with an acute surgical abdomen and hypotension. During the surgery, Dr. Winter discovered bleeding from a ruptured spleen and a tear in Mrs. Johnson's mesenteric vein. He repaired both and stopped the bleeding. During the surgery, however, Mrs. Johnson lapsed into a coma from which she never awoke. She died on April 30, 1998.

Plaintiff, individually and as general administrator *ad prosequendum*, instituted a malpractice action against Dr. Dobrosky on behalf of himself and his children. Dr. Dobrosky, in turn, claimed that Dr. Winter was negligent for not promptly responding to his request for a surgical consult. Plaintiff subsequently amended the complaint to add Dr. Winter as a defendant.

At trial, plaintiff sought to preclude mention of Mrs. Johnson's 1994 conviction for welfare fraud on the ground that that evidence was irrelevant and unduly prejudicial. The trial judge determined that the conviction was marginally relevant under *N.J.R.E.* 401 because it had an impact on damages, but excluded it under *N.J.R.E.* 403 because its slight probative value was substantially outweighed by its strong tendency to prejudice the jury against Mrs. Johnson.

Near the end of trial, however, at an informal charge conference, the trial judge changed his mind. On reviewing the model jury instruction on damages in a wrongful death case,[4] he informed the attorneys that the welfare fraud conviction was "obviously relevant" because Mrs. Johnson's character was at issue.[5]

Plaintiff did not testify during his case but was later called by Dr. Dobrosky's counsel, who elicited information concerning Mrs. Johnson's welfare fraud conviction along with evidence that plaintiff had been unemployed for five years and that he and his wife had been separated on occasion. Dr. Winter's counsel then cross-examined plaintiff, adducing testimony that he had been convicted some years earlier of receiving stolen property and possessing drugs. The trial judge later instructed the jury that plaintiff's convictions could only be considered when weighing his credibility as a witness.

---

[4] In relevant part, the model jury instruction states:

In considering those various factors, and in ascertaining the probabilities of pecuniary loss, you should also consider the decedent's personality and character, his/her habits and customs and the relationship that existed between the decedent and the survivors.
[*Model Jury Charges (Civil)* § 6.16(5) (May 1984).]

[5] Specifically, the judge stated:

All right, well, let me indicate for the record that I originally ruled that the conviction for welfare fraud would not be admissible for reasons I had then given. When we were having our informal charge conference, after reviewing the charge for wrongful death, very specifically it indicates the character of the decedent is at issue, which is obviously against the normal ... presumed standard that the character is not usually at issue in personal type litigation. That being the case, I'm of the opinion that a conviction for welfare fraud is obviously relevant. It would be actually dishonest for me to say its not relevant under Rule 401 as to somebody's character. And although the Court always has 403 concerns, in my judgment the probative value—from what I understand it was a conviction in the 1990's.... In other words, it wasn't a 30–year old conviction or something. It's not a remote conviction. It's not a conviction for the type of crime that would so mortify the jury such as a sexual assault offense or something involving children, something like that, and I think based upon the charge, that the Court had to reverse itself in regard to that issue.

In closing arguments, defense counsel underscored Mrs. Johnson's criminal convictions as bearing on her "character":

[O]bviously you've heard testimony from [plaintiff] with respect to his wife and with respect to her welfare fraud conviction. And, again, that, as the Court has ruled, is admissible, and it is admissible, because one of the things that you have to consider is the—not only the health of the person who died but the character of the person who died.

And, I don't mean to in any way besmirch the character of Mrs. Johnson, but the question is you're entitled to full information, and in an effort to try to give you full information we decided that we would call Mr. Johnson as a witness.

After deliberations, the jury rejected plaintiff's liability claims entirely, finding that neither Dr. Dobrosky nor Dr. Winter deviated from the standard of care in their treatment of Mrs. Johnson.

Although the trial judge stated that the exoneration of both doctors was a "big surprise," he denied plaintiff's motion for a new trial. In explaining that decision, the judge stated that despite the fact that it was an "excruciating[ly] close call," the jury's result was "just short" of constituting a miscarriage of justice.

Plaintiff appealed, and the Appellate Division affirmed, declaring, among other things, that the welfare fraud conviction was admissible because character is "in issue" in a wrongful death action.

## II

Plaintiff argues that, in a wrongful death case where damages are sought only for lost advice, guidance and counsel and not for future financial contributions, a welfare fraud conviction has no bearing on any relevant trait of character and is therefore inadmissible. In the alternative, plaintiff asserts that even if the evidence was admissible, it was more prejudicial than probative and should have been excluded.

Defendants counter that because character is in issue in determining damages in all wrongful death cases, a welfare fraud conviction is admissible. More specifically, defendants argue that a welfare fraud conviction is relevant to the jury's determination of the "quality," and thus value, of the advice that decedent would

have given her children had she lived. On the issue of unfair prejudice, defendants maintain that the trial judge was within his discretion in determining that the probative value of the welfare fraud conviction was not substantially outweighed by its prejudicial effect.

## III

*N.J.R.E.* 404(c) provides, in relevant part, that "[e]vidence of a person's character or trait of character is admissible when that character or trait is an element of a claim or defense." The obvious corollary of that limited rule of admissibility is that evidence of a person's character or a trait thereof is not admissible when it is not an element of a claim or defense. Admissibility thus depends upon the connection between proffered character evidence and a claim or defense that is actually in issue. That limitation reflects the danger inherent in the introduction of such evidence—"its susceptibility to convert a trial of the issue to a judgment of the person." *State v. Burke,* 354 *N.J.Super.* 97, 109, 804 *A.*2d 617 (Law Div.2002). Thus, for character evidence to be admissible under *N.J.R.E.* 404(c), a person's character or a trait of his character must be related to a specific claim or defense in the case. For example, in a libel action where truth is interposed as a defense, the defendant's liability depends on whether the alleged bad trait of plaintiff that defendant published was actually true; in such a case that trait is in issue. Biunno, *Current N.J. Rules of Evidence,* comment 18 on *N.J.R.E.* 404(c).

In this case, in which the sole wrongful death claim for damages was for the loss of Mrs. Johnson's advice, guidance and counsel, the trial judge ruled that Mrs. Johnson's prior welfare conviction was admissible because her character was in issue. That ruling is the nub of the case and it obviously overstates the relevant admissibility principles. Indeed, as a general matter, a decedent's character is no more at issue in a wrongful death case than would be a plaintiff's character in an automobile negligence case. The question is whether Mrs. Johnson's prior welfare conviction bore

on some particular aspect of her claim within the meaning of *N.J.R.E.* 404(c). The answer to that question requires exploration of the wrongful death cause of action.

## IV

Unlike a survival action under *N.J.S.A.* 2A:15–3, which seeks damages for the decedent's losses before death, an action under the Wrongful Death Act (the Act), *N.J.S.A.* 2A:31–1 to –6, seeks recompense for the losses suffered by the survivors as a result of the decedent's death. *Smith v. Whitaker*, 160 *N.J.* 221, 234, 734 *A.*2d 243 (1999). Also, unlike a survival action, in which an executor may recover both pecuniary and non-pecuniary losses for which the decedent could have recovered had he not expired, in a wrongful death action, damages are strictly limited to those that are pecuniary in nature. *Ibid.*

The historical roots of the pecuniary limitation in a wrongful death action are important to the disposition of the issue before us. At common law, a wrongful death action was not recognized. *Negron v. Llarena*, 156 *N.J.* 296, 308, 716 *A.*2d 1158 (1998) (citing *Baker v. Bolton*, 170 Eng. Rep. 1033 (1808), for proposition that "[i]n a civil Court, the death of a human being could not be complained of as an injury"). The policy underlying that rule is somewhat obscure, but it is thought to have been based, in part, on a technical application of the archaic felony-merger rule [6] and in part on the notion that the "value of human life is too great to be estimated in money." *Cooper v. Shore Elec. Co.*, 63 *N.J.L.* 558, 564, 44 *A.* 633 (1899).

In England, the prohibition against wrongful death actions was modulated in 1846 with the passage of Lord Campbell's Act. W. Page Keeton et al., *Prosser and Keeton on Torts* § 127 at 945 (5th

---

[6] The felony-merger rule required forfeiture of the felon's property to the Crown, thereby leaving no property for the survivors to claim. *See Smith v. Whitaker*, 160 *N.J.* 221, at 231 n. 2, 734 *A.*2d 243 (1999) (quoting *Giardina v. Bennett*, 111 *N.J.* 412, 423 n. 1, 545 *A.*2d 139 (1988)).

ed. 1984). Although Lord Campbell's Act did not contain an explicit limitation on the types of damages that could be recovered in a wrongful death case, English case law interpreting it quickly imposed the "pecuniary" limitation, allowing purely monetary damage awards but forbidding those for loss of society or bereavement. Stuart M. Speiser and Stuart S. Malawar, *An American Tragedy: Damages for Mental Anguish in Bereaved Relatives in Wrongful Death Actions,* 51 *Tul. L.Rev.* 1, 5–8 (1976). In essence, by allowing some damages and disallowing others, the early cases split the difference between the idea that a human life could not and should not be valued monetarily and the desire to compensate families for the untimely loss of a loved one. Accordingly, pecuniary losses, objectively capable of calculation, were allowed.

New Jersey enacted its first wrongful death statute in 1848. *P.L.* 1848, *p.* 151 (March 3, 1848); *Cooper, supra,* 63 *N.J.L.* at 563, 44 *A.* 633. Following Lord Campbell's Act and the English decisions interpreting it, New Jersey's Wrongful Death Act, like almost all wrongful death legislation enacted in America, included a limitation on damages to the "pecuniary" injuries suffered by the survivors. *See* Speiser & Malawar, *supra,* 51 *Tul. L.Rev.* at 17 (discussing wrongful death legislation in the 19th century). Early judicial construction of the Act in New Jersey interpreted the pecuniary limitation as barring any award for loss of society or emotional pain. *Paulmier v. Erie R.R. Co.,* 34 *N.J.L.* 151, 157 (1870) (stating, "[b]y force of the English statute on this subject ... in estimating damages, mental suffering, or the loss of the society of the person killed, cannot be taken into consideration"). More particularly:

> With respect to the damages recoverable in such a suit, they are not such as arise from injury to the feelings, but are awarded in reference to a pecuniary loss, and in estimating damages the jury cannot take into consideration mental suffering or loss of society, but must give compensation for pecuniary injury only. Such an action cannot under the terms of the statute be maintained for nominal damages. Not that the proof with respect to the personal injury need be such that the amount of such damages may appear with exactness. If the evidence be such as to show a reasonable expectation of pecuniary advantage, the extinction of such an expectation by an act occasioning the death of the party from whom it arises will sustain the action, and it is for the jury to say under all the circumstances, taking

into account all the uncertainties and contingencies of the particular case, whether there was such a reasonable and well-founded expectation of pecuniary benefit as could be estimated in money, and so become the subject of damages. In the case last cited Chief Justice Beasley said: "It will be observed that this rule assumes that the pecuniary injury designated by the statute is nothing more than a deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased. It is upon this principle that our statute is to be applied. The jury must weigh probabilities, and to a large extent form their estimate of damages on conjectures and uncertainties."

[*Cooper, supra,* 63 *N.J.L.* at 567, 44 *A.* 633 (citations omitted).]

The pecuniary limitation continues as a component of the Wrongful Death Act, which presently provides, in relevant part:

[T]he jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.

[*N.J.S.A.* 2A:31–5.]

The most common class of pecuniary injury under the Act is the loss of future financial contributions, that is, the Act attempts to replace the money that decedent would have contributed to his or her survivors had he lived. *See, e.g., Curtis v. Finneran,* 83 *N.J.* 563, 567–68, 417 *A.*2d 15 (1980) (explaining calculation of lost future financial contributions). The calculation of those losses involves two basic determinations: is it probable that decedent would have contributed to the survivors and, if so, to what extent would contributions have been made? In resolving those issues

the jury should ... consider the various probabilities which, in the course of the years, might determine the pecuniary advantages which would accrue to the next of kin if the tragic event which gave rise to the action had not occurred: The normal life expectancy of the decedents; their physical, mental and moral characteristics; their likely earnings; the expense to the mother of [raising children]; the life expectancy of the next of kin; all leading to a finding of what contributions and for what periods the decedents would probably have made to the next of kin, or some of them.

[*McStay v. Przychocki,* 10 *N.J.Super.* 455, 462, 77 *A.*2d 276 (App.Div.1950), *aff'd,* 7 *N.J.* 456, 81 *A.*2d 761 (1951).]

In other words, in a lost financial contribution case, in addition to evidence of earnings and earning capacity, expert financial projections, and life expectancy tables, the jury may consider any other evidence that bears on the likelihood and

extent that the decedent would have made financial contributions to the survivors. For example, the jury could consider a decedent's age and physical or mental health as limiting or extending the period of future potential loss. Likewise, if a decedent had not worked for many years, or was serving a long jail sentence, a jury could discount the probability that he would have supported the survivors. Each of those characteristics has specific probative value in respect of the "hypothetical future likelihood of the decedent's making contributions to those entitled to recover." *See Gerstenberg v. Reynolds*, 259 *N.J.Super.* 431, 436, 614 *A.*2d 163 (Law Div.1991) (prior suicide attempt probative of likelihood of decedent's making future contributions to family); Biunno, *supra*, comment 18 on *N.J.R.E.* 404(c).

▮ As in any personal injury action, however, what is *not* admissible in a lost future financial support case is evidence of the decedent's "character" that does not directly relate to the likelihood or unlikelihood of future financial contributions estimable in money. *See, e.g., St. Clair v. E. Air Lines, Inc.*, 279 *F.*2d 119, 121 (2d Cir.) (holding past marital misconduct irrelevant because "[e]xcept as they may show a propensity of the decedent to spend his income in ways which do not inure to the benefit of his family, the details of [decedent's] personal life are not in issue"), *cert. denied*, 364 *U.S.* 882, 81 *S.Ct.* 171, 5 *L.Ed.*2d 104 (1960); *Clement v. Consol. Rail Co.*, 130 *F.R.D.* 530, 540 (D.N.J.1990) (finding evidence of decedent's prior drug and alcohol use inadmissible where there was a "relevancy gap" between that character evidence and the determination of earning capacity or health).[7] As Stuart M. Speiser, a scholar on the calculation of damages in wrongful death actions, has more broadly stated:

> An initial limitation on the introduction of evidence that the decedent was a person of bad moral character is that *such evidence must be relevant to some aspect of the damages claimed by the plaintiff.*

---

[7] To the extent that *Wimberly v. Paterson*, 75 *N.J.Super.* 584, 611, 183 *A.*2d 691 (App.Div.1962), suggests a broader admissibility rationale for the admission of character evidence in a wrongful death case, it is disapproved.

[Stuart M. Speiser, *Recovery for Wrongful Death & Injury* § 6:26 (4th ed. 2005) (emphasis added).]

Put another way, the fact "[t]hat some aspect of a decedent's character may properly be shown in determining the damages to be awarded in a wrongful death action does not mean, however, that all his habits and qualities are relevant." *St. Clair, supra,* 279 *F*.2d at 121. That is the backdrop on which the admission of Mrs. Johnson's welfare fraud conviction must be assessed.

V

In 1980, in *Green v. Bittner, supra,* 85 *N.J.* at 4, 424 *A*.2d 210, we expanded the category of pecuniary damages to include not only the loss of future financial contributions but also the lost "value" of services such as companionship and care (in the case of the death of a child) and the loss of advice, guidance and counsel (in the case of the death of a parent). Chief Justice Wilentz, writing for the Court, described companionship and care as the loss of a type of household services provided by in-home nurses or those employed to care for the infirm. *Id.* at 12, 424 *A*.2d 210. He likewise defined the loss of guidance, advice and counsel to be

confined to its pecuniary element. It is not the loss simply of the exchange of views, no matter how perceptive, when child and parent are together; it is certainly not the loss of the pleasure which accompanies such an exchange. Rather it is the loss of that kind of guidance, advice and counsel which all of us need from time to time in particular situations, for specific purposes, perhaps as an aid in making a business decision, or a decision affecting our lives generally, or even advice and guidance needed to relieve us from unremitting depression. *It must be the kind of advice, guidance or counsel that could be purchased from a business adviser, a therapist, or a trained counselor, for instance. That some of us obtain the same benefit without charge from spouses, friends or children does not strip it of pecuniary value.*

[*Green, supra,* 85 *N.J.* at 14, 424 *A*.2d 210 (footnote omitted) (emphasis added).]

The Chief Justice continued:

When a parent dies and loss of advice, guidance and counsel is allowed to the surviving children, and when an infant child dies and loss of prospective services is allowed to the parents, *the proof that suffices is the parent-child relationship and what we assume the jury can conclude from that relationship alone.* Damages are allowed without any showing that the parent had actually been rendering valuable advice, or was likely to do so, or that the child—even if only five months old—was likely to render services around the house.

[*Id.* at 15, 424 *A.*2d 210 (citations omitted) (emphasis added).]

Describing the jury's function, *Green* followed the two-pronged paradigm used in a lost financial contribution case: is it likely that advice, guidance and counsel would have been given and, if so, at what cost could it have "be[en] purchased from a business adviser, a therapist, or a trained counselor"? *Id.* at 14, 424 *A.*2d 210. With respect to the former, *Green* held that "the proof that suffices is the parent-child relationship." *Id.* at 15, 424 *A.*2d 210. Under *Green,* the jury's focus is on the existence of that relationship and the value of the advice, guidance and counsel that inhere in it.

Once the parent-child relationship is established, *Green* proffers an objective standard for calculating the value of advice, guidance and counsel—stating that it must be confined to what "the marketplace would pay" for lost household services or the services of a business adviser, therapist or trained counselor. *Id.* at 12, 424 *A.*2d 210; *see, e.g., Morris v. Krauszer's Food Stores, Inc.,* 300 *N.J.Super.* 529, 541, 693 *A.*2d 510 (App.Div.) (affirming jury award where expert testified that lost guidance, instruction and training to children was worth $45 per hour), *certif. denied, Morris v. Convenience Mgmt. Servs.,* 151 *N.J.* 77, 697 *A.*2d 549 (1997). Thus, although *Green* expanded the category of pecuniary losses to include advice, guidance and counsel, it took pains to limit those damages to the market value of the services. Indeed, it was that limitation that justified inclusion of that category of pecuniary damages in the first instance. *Green, supra,* 85 *N.J.* at 4, 424 *A.*2d 210. By measuring the loss according to the market value of a therapist, business adviser or counselor, *Green* eliminated any assessment by the jury of a particular deceased parent's traits of character as bearing on the high or low "quality" of the decedent and hence of the advice to be rendered.

To be sure, as in the case of lost financial contributions, mental, moral and physical characteristics of the decedent that actually bear on the relationship of parent and child and the concomitant "probability" of lost advice, guidance, and counsel are

legitimate factors for jury consideration under *Green.* Thus, for example, evidence that a parent was wholly absent from the child's life would be admissible to show that the predicate relationship under *Green* was lacking thus obviating any assumption that future advice, guidance and counsel would have been rendered. Similarly, if the parent was extremely ill or elderly that evidence could be considered as bearing on the duration of future help and guidance. To the extent that the bad acts of a decedent, including criminal convictions, are relevant to the relationship of a parent and child (e.g., crimes by the parent against the child), they too would be admissible, obviously subject to *N.J.R.E.* 403. Again, the polestar is relevance to the relationship of parent and child and the likelihood that advice, guidance and counsel would be rendered. *Green, supra,* 85 *N.J.* at 15, 424 *A.*2d 210. What is *not* admissible is general character evidence offered to prove, for example, that the decedent was lazy, had loose morals, or was otherwise a person of bad character and hence would give bad advice.

That prohibited purpose is exactly why defendants proffered Mrs. Johnson's welfare fraud conviction in this case. Indeed, it was not offered as a reflection on the relationship she had with her family (her children testified to that) or the "probability" that she would or would not advise, guide and counsel them in the future. Nor could it have been; a single welfare fraud conviction simply does not bear on the pivotal issue of Mrs. Johnson's relationship to her children. Perhaps recognizing that, defendants presented Mrs. Johnson's conviction, according to them, to prove her "poor judgment" and the lower "quality" of the advice she would have given. Although claiming that they did not intend to "besmirch" Mrs. Johnson, defendants trenched on the interdiction against valuing human life by presenting her to the jury as a person of bad character. Such an attack would not have been permitted in an ordinary personal injury case and should not have been allowed here because it was irrelevant to the relationship of Mrs. Johnson to her children, effectively placed in issue her

quality as a person, and violated the narrow margins by which *Green* carefully compartmentalized what damages could be allowed in an advice, guidance, and counsel case.

## VI

The ultimate question is whether the improper admission of the evidence of Mrs. Johnson's conviction warrants reversal. Here, liability and damages were tried together. Initially, the trial judge declined to admit the evidence of Mrs. Johnson's conviction on the ground that, even if relevant, it would so prejudice her in the eyes of the jury that its exclusion under *N.J.R.E.* 403 was compelled. It was only after the judge mistakenly read the Model Jury Charge as mandating the admission of the conviction that he allowed it to be elicited.[8] By that time, the trial was nearly over and it was too late for the judge to consider bifurcating liability from damages pursuant to *Rule* 4:38–2(b), although all parties agree that in no event would Mrs. Johnson's conviction have any relevance to the issue of defendants' malpractice. *See Ocasio v. Amtrak,* 299 *N.J.Super.* 139, 159–60, 690 *A.*2d 682 (App.Div.1997) (stating bifurcation appropriate where limiting instruction insufficient to cure undue prejudice). As we have pointed out, the trial judge was shocked by the liability verdict that exonerated both defendants and declared, as well, that the motion for a new trial was an "excruciatingly close" call. We have carefully reviewed this record and have concluded, in light of the foregoing, that we cannot say with confidence that the liability verdict was reached solely on the merits and that it was not a result of the improper admission of Mrs. Johnson's criminal record. We therefore reverse and remand for a new trial.

We add only this. Before the new trial, should the judge determine that other negative character evidence that satisfies the standards of *N.J.R.E.* 404(c) is admissible, he should consider whether bifurcating liability from damages is warranted. In the

---

8 See *supra* note 4 for the relevant portion of the Model Jury Instruction.

interim, we refer this matter to the Model Civil Jury Charge Committee to clarify section 6.16 (Wrongful Death) in accordance with the principles to which we have adverted.

## VII

The judgment of the Appellate Division is reversed. The case is remanded for proceedings consistent with this opinion.

Justice RIVERA–SOTO, dissenting.

In this case, the majority holds that it was error for the trial court to admit evidence of a decedent's recent conviction and custodial sentence for welfare fraud [1] concerning decedent's character, *ante*, 187 *N.J.* at 611–12, 902 *A.*2d at 249 (2006), and that such error merits a remand to the trial court. *Ante*, 187 *N.J.* at 612, 902 *A.*2d at 249 (2006). I respectfully dissent as to both conclusions.

## I.

As the majority recognizes, in respect of proofs of damages in a wrongful death action, "mental, moral and physical characteristics of the decedent that actually bear on the relationship of parent and child and the concomitant 'probability' of lost advice, guidance and counsel are legitimate factors for jury consideration under *Green [v. Bittner,* 85 *N.J.* 1, 4, 424 *A.*2d 210 (1980)]." *Ante*, 187 *N.J.* at 610–11, 902 *A.*2d at 248 (2006). Common sense tells us that, in the context of determining a damages award, there can be few more relevant proofs of a decedent's mental and moral characteristics that bear on child-rearing qualities than a recent conviction and incarceration for a crime. That is even more so when, as here, the crime for which the decedent was convicted and incarcerated was welfare fraud, a *crimen falsi* or crime of falsehood or dishonesty.

---

[1] Decedent's welfare fraud conviction was in 1994; she arrived at the emergency room on December 11, 1997 and died in April 1998.

Recognizing the relevance of the decedent's prior conviction to plaintiff's damages claim, the Appellate Division reasoned that the standard by which the admissibility of the decedent's prior conviction was to be gauged was straightforward: was the evidence relevant under *N.J.R.E.* 401, and, if so and applying the balancing test of *N.J.R.E.* 403, did the undue prejudice of that evidence substantially outweigh its probative value? The panel's reasoning is instructive and is set forth at length:

> Relevant evidence is "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. Except as otherwise provided by the New Jersey rules of evidence or by law, "all relevant evidence is admissible." *N.J.R.E.* 402. Nevertheless, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury...." *N.J.R.E.* 403. The decision to exclude or admit evidence pursuant to *N.J.R.E.* 403 is within the discretion of the trial judge. *Benevenga v. Digregorio*, 325 *N.J.Super.* 27, 32, 737 *A.*2d 696 (App.Div.1999), *certif. denied*, 163 *N.J.* 79, 747 *A.*2d 287 (2000). We review these decisions under the abuse of discretion standard. *Ibid.* These rulings are entitled to substantial deference. *State v. Morton*, 155 *N.J.* 383, 453, 715 *A.*2d 228 (1998), *cert. denied*, 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001).
>
> *N.J.R.E.* 404(c) provides that "[e]vidence of a person's character or trait of character is admissible when that character or trait is an element of a claim or defense." This rule "applies only to those relatively few situations where under the substantive law of New Jersey a person's character or a trait of his character is actually in issue." Biunno, *Current N.J. Rules of Evidence*, comment 18 on *N.J.R.E.* 404 (2004).
>
> Character is in issue in a wrongful death case. *N.J.S.A.* 2A:31-5 provides that in a wrongful death action, "the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent." Those damages "represent the actual pecuniary or financial loss which plaintiff contends has been and will in the future be suffered by the survivors due to the death of the decedent." *Model Jury Charge* (Civil) 6.16, "Wrongful Death," (1984). In a wrongful death case, "[t]o determine the amount of damages to be awarded ... all circumstances and probabilities which bear upon that financial loss may be considered." *Ibid.* Several factors are listed for the jury's consideration. *Ibid.* One is "the benefit given by the decedent to a survivor or survivors in the form of services or assistance rendered by the decedent and in guidance and training which may have been offered by the decedent to the survivors." *Id.* at 6.16.4. "In considering those various factors, and in ascertaining the probabilities of pecuniary loss, [the jury] should also consider the decedent's personality and character, his/her habits and customs and the relationship that existed between the decedent and the survivors." *Id.* at 6.16.5. Thus, the decedent's character is placed in issue.

. . . .

Here, decedent's welfare fraud conviction was relevant to the damages element of the wrongful death claims. It had "a tendency in reason to prove or disprove" that prior unlawful activity that occurred within three or four years of her death, affected the quality of her life and the quality of the advice and guidance she could give to her sons. *N.J.R.E.* 401. After a thorough *N.J.R.E.* 403 analysis, the trial court found that introducing evidence of the conviction was not substantially outweighed by the risk of undue prejudice. Giving the trial judge the substantial deference he is due, we find no abuse of discretion. The evidence was highly probative of the damages claim. *See Ocasio [v. Amtrak,* 299 *N.J.Super.* 139, 160, 690 *A.*2d 682 (App.Div.1997) (evidence of drug abuse highly probative of damages claim)]. The nature of the crime, welfare fraud, bears directly upon decedent's character, which impacts the quantum of damages to which her children may be entitled for the loss of her guidance. Once again, the question becomes one of weight rather than admissibility.

I fully concur with the Appellate Division's careful treatment of this issue. To hold otherwise, as the majority does, blurs the distinction among types or categories of damages our cases strive to achieve. As *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 48, 477 *A.*2d 1224 (1984), explains:

The three basic types of legal damages are compensatory, nominal, and punitive. Compensatory damages are designed to compensate a plaintiff for an *actual* injury or loss. Nominal damages, unlike compensatory damages, do not attempt to compensate the plaintiff for an actual loss. Rather, they are a trivial amount "awarded ... as a judicial declaration that the plaintiff's right has been violated." Finally, punitive damages are awarded as punishment or deterrence for particularly egregious conduct.

[(emphasis supplied; citations omitted).]

The vice of the majority's conclusion that it was error to admit proof of the decedent's welfare fraud conviction is that it eliminates the requirement that compensatory damages be tethered to actual losses. If the jury is not to be told that the decedent is a convicted felon, the only proofs before the jury are those elicited from her children in plaintiff's case-in-chief that she was a wonderful, nurturing mother who was ever-present in her children's lives. According to the majority, and notwithstanding these claims, the jury is to remain unaware of, and therefore barred from considering, how the decedent could have discharged the duties of a wonderful parent during her 30–day stay in the county jail. Both

plaintiffs *and* defendants are entitled to fair trials, and the majority's result violates that core principle of fundamental fairness.

## II.

That said, I also dissent from the majority's conclusion that the trial court's admission of the decedent's prior conviction must play a role in the trial court's renewed consideration of plaintiff's new trial motion. It is clear that the decedent's conviction was relevant as to damages only, and not as to liability. It is equally clear that, because the jury determined there was no cause of action on plaintiff's negligence claims against defendants, the jury never reached the issue of damages. It was and remained plaintiff's obligation to protect his record. Yet, plaintiff made no application to bifurcate this trial between liability and damages as provided by *R.* 4:38–2(b). Indeed, plaintiff did not consider the issue of the decedent's conviction to be of sufficient import to include in his new trial motion.[2]

Therefore, because plaintiff did not request that "the issues of liability and damages be separately tried[,]" *R.* 4:38–2(b), the trial court's judgment should stand and a remand is inappropriate here.

---

[2] Plaintiff's notice of motion for a new trial states that "in support of this application, plaintiff shall rely upon the attached certification and brief of [plaintiff's counsel]." The new trial motion certification of plaintiff's counsel consists of nineteen numbered paragraphs, not one of which mentions the admission of the decedent's conviction as a ground for relief; plaintiff did not include in the appendix his brief in support of his new trial motion. At the argument on plaintiff's new trial motion, the trial court acknowledged, as the majority notes, that "this is a very close case on the motion" and that it was "just short" of presenting the "clear and convincing appearance of a miscarriage of justice." *Ante,* 187 *N.J.* at 603–04, 902 *A.*2d at 243–44 (2006). The trial court, however, did not make those observations in reference to the admission of the decedent's conviction. Those remarks were made in the context of plaintiff's sole claim on his motion for a new trial: that because "[a]ll parties agreed that the standard of care required a surgeon to respond to the consult requested [and there was a two-hour delay in the response], there had to be negligence either in the requesting of the consult or in responding to the consult." That is the limited context in which the trial court made its remarks, and it is in that limited context that they must be examined.

## III.

In my view, the judgment of both the trial court and the Appellate Division should be affirmed. Thus, I respectfully dissent.

*For reversal and remandment*—Chief Justice PORITZ, and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For affirmance*—Justice RIVERA–SOTO—1.