942 A.2d 1 (2008)
398 N.J. Super. 266
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
M.W., Defendant-Appellant,
In the Matter of the Guardianship of R.W., F.W. and T.H., Minors.
New Jersey Division of Youth and Family Services, Plaintiff-Respondent,
v.
T.H., Defendant-Appellant,
In The Matter of the Guardianship of T.H., A Minor.
Superior Court of New Jersey, Appellate Division.
Argued April 25, 2007.
Decided August 10, 2007.
Supplemental Opinion February 26, 2008.
*3 Michael C. Kazer, Designated Counsel, Jersey City, argued the cause for appellant M.W. (Yvonne Smith Segars, Public Defender, attorney; Mr. Kazer, on the brief).
Yvonne Smith Segars, Public Defender, attorney for appellant T.H. (William J. Sweeney, Designated Counsel, on the brief).
Eleanor Armstrong, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (Stuart Rabner, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Armstrong, on the brief).
Melissa Vance, Assistant Deputy Public Defender, argued the cause respondents minor children R.W., T.H., Jr. and F.W. (Yvonne Smith Segars, Public Defender, Law Guardian for minors; Ms. Vance, on the brief).
Edward Hornstein of the New York bar, New York City, admitted pro hac vice, argued the cause for amicus curiae the minor child F.D.W. (Morgan, Lewis and Bockius, attorneys; Todd D. Brody and Mr. Hornstein, of counsel; Scott E. Ross, on the brief).
Before Judges COLLESTER, SABATINO and LYONS.
The opinion of the court was delivered by
COLLESTER, J.A.D.
"This is an appeal from a judgment retroactively terminating the parental rights of the natural mother to her deceased child, and alternatively, holding that the mother's right of inheritance by intestacy is extinguished on equitable grounds. This novel issue was precipitated by a complaint for guardianship brought by the Division of Youth and Family. Services (the Division) to terminate M.W.'s parental rights to three of her sons: T.H., Jr., born August 28, 1998; R.W. born on June 13, 1995; and his identical twin, F.W., who died on January 5, 2003.[1] In an earlier opinion we affirmed *4 that portion of the judgment terminating M.W.'s parental rights to R.W. and T.H., Jr. We now review the determination of the trial judge as to the deceased F.W. In doing so it is necessary to repeat some of the facts set forth in our prior opinion.
The facts of this case would shock the cynical and wound the most hardened of heart. When the circumstances were reported by the media, the case outraged the citizenry and shook the foundations of the State's child support system. It began on the morning of January 4, 2003, when the Newark Police Department received an anonymous 9-1-1 call reporting that two beaten and starving children were found locked in the basement of an apartment building at 188 Parker Street. When police arrived, they were met by Shawn Slappy who said he made the 9-1-1 call. Slappy told them he was the boyfriend of Sherry Murphy, who was a tenant in the building, and that he moved in with her about two weeks earlier. He said he was unaware of the existence of these children until that morning when he used a screwdriver to pry open the locked basement door to search for a pair of his boots he believed Murphy put in the basement. When he saw "something moving," he investigated and was shocked to find two young boys locked in a dark and fetid room with only a bed, no sink, no toilet, and no food. Slappy brought the frightened children upstairs to Sherry Murphy's apartment and made the 9-1-1 call.
The condition of the two boys was deplorable. They were emaciated with burn marks and new and old bruises all over their bodies, evidencing severe physical abuse. Their hair was matted. They smelled rank because their clothing was filthy with urine and feces. Seven-year-old R.W. told police "Sherry" put them in the basement. The police asked Slappy where Sherry Murphy was, and he said she left early that morning. He had no idea where she was or when she would return.
The boys were taken by EMT to University Hospital in Newark for examination and treatment, and the Division of Youth and Family Services ("the Division") was notified. Division worker Sandra Osborne responded to the hospital at about 11:30 a.m. She reported as follows:
[T.H., Jr.], age 4, appeared to be extremely weak and needed assistance standing. He was not able to verbalize at all. However he understands what is being said to him. [He] has multiple bruises over his entire body and appears to have been burned over the buttocks, arms, legs, face and stomach. He is very thin and frail for his age. [R.W.], age 7, was able to provide his name and also his brother's name. [R.W.] was also filthy with old burns and marks on back and neck. His skin is dry and scaly, clothes were wet with the smell of urine. He was very weak and hungry. [R.W.] gave his age as 6 years old, but did not know his brother[']s age. Both boys appear to be underdeveloped for [their] ages. It is not known how long the children were in the basement, however, it appears that they have been locked up for 3 to 4 weeks.
[R.W.] was able to tell me that Sherry put him and his brother in the basement. He stated that she only fed them sometime[s] not all the time. I asked [R.W.] how did he get the bump on his eye. He stated "Sherry punched me in my face for peeing on the floor." He also said that she put [T.H., Jr.] in hot water because he did "do, do" on the floor. I then asked [R.W.] did he know *5 where his mother was and he responded, "Yes." I said where is she? He responded, "She's locked up." I asked [R.W.] how long has he and his brother been in the basement? He responded, "A long time." . . . [R.W.] did not want to answer any more questions at that `time because he wanted to eat.
Hospital records and medical reports confirm the pitiful condition of the two boys. Four-year-old T.H., Jr. had hypopigmented patches on his skin resembling burns, scaling skin, osteopenia (generalized reduction of bone mass), significant dental decay, and a distended abdomen. Circumferential scarring around the ankles, wrists, and neck indicated he was bound with some type of restraints. He weighed only twenty-nine pounds and measured three feet tall, both under the third percentile for a four-year-old. Burn scars on his chest, neck, feet, and buttocks were consistent with second degree burns. As a result of the burn scarring, T.H., Jr. had to wear a compression garment suit over his entire body for twenty-three to twenty-four hours a day for almost a year. Seven-year-old R.W., twin of the deceased F.W., was emaciated. He weighed thirty-seven pounds and was three and one-half feet tall, a height and weight below the third percentile for a child of his age. Physical examination disclosed multiple scars, old burns, lesions, scabbing, dried skin, a distended stomach, and severe dental decay. He suffered from chronic protein calorie malnutrition and micronutrient deficiency.
A hospital registration clerk searched the computer for past admittances and discovered M.W. was the mother of the two boys. A contact number was listed for her in New York City. When Osborne called the number, R.G. answered the phone and said she was M.W.'s sister and the children's aunt. She related that every time she asked M.W. about the children, M.W. was "vague," saying only that they were temporarily staying with her cousin, Sherry Murphy, in Irvington until M.W. could find her own apartment. R.G. told Osborne that the children had lived with Murphy from March 2001 to July 2001 while M.W. served a jail sentence and that when she was released, M.W. moved into Murphy's apartment. R.G. said Murphy threw M.W. out after an argument a month later, and M.W. left her children. M.W.'s oldest son, ten-year-old F.D.W., left Murphy's home to live with R.G. and her son in New York. The three younger boys remained with Murphy. When Osborne told her that only R.W. and. T.H., Jr. were found in the basement, R.G. became concerned because she knew F.W. was also living with Murphy. R.G. told Osborne that she believed M.W. was living in Newark with P.W., another sister, and she supplied the' telephone number.
Osborne checked Division records and found that M.W. did have another son named F.W. who was R.W.'s twin brother. She then spoke to P.W. who told her that M.W. had been living with her since leaving Murphy's apartment in August 2001. P.W. said that when she asked about the boys, M.W. told her that F.D.W. was living in New York with R.G.'s son and the other three were living with relatives in North Carolina. P.W. said that M.W. was not at her home and had left that morning to go to New York. When Osborne told P.W. about the discovery that morning of the two boys in the basement, P.W. became very disturbed and went to University Hospital to see them. At the hospital P.W. told Osborne that she was very upset that F.W. was missing because she had no idea where the child might be. When asked about Sherry Murphy, P.W. said she was M.W.'s cousin and worked nights in various bars as a go-go dancer.
*6 Caseworker Osborne then spoke to eight-year-old R.W. and asked him about his twin brother. R.W. said that the last time he saw F.W. was "a long time ago" when "Joe" took him and "Sherry put [him] in hot water and he was screaming." "Joe" was later identified as Joseph Reese, Sherry Murphy's former boyfriend. R.W. later reported that he had been sexually abused by Reese.
That night the Newark Police Department issued, a missing persons bulletin for F.W. and then continued the search for M.W. and Sherry Murphy. Later the police received information that M.W. was admitted to Lincoln Hospital in the Bronx after being struck by an automobile. The night ended with no information on either Sherry Murphy or the missing F.W.
At about 3 p.m. the following afternoon, Newark police officers returned to the basement at 188 Parker Street with a trained cadaver-sniffing dog. They found what they feared mostthe decaying body of seven-year-old F.W. in a Rubbermaid storage bin located about fifteen feet from where his brothers were found the day before. The desiccated corpse was so badly decomposed that only DNA could verify identity. No remaining facial features remained no eyes, no nose, and no lips. F.W. was pronounced dead at 3:35 p.m. that day, January 5, 2003, but it was the opinion of the medical examiner that the child had been dead for several weeks. The death certificate listed F.W.'s death as a homicide and noted blunt trauma to the head and abdomen.
The gruesome discoveries in the Newark basement of two starving and abused young boys and the mummified remains of a third spurred extensive media coverage throughout New Jersey and the metropolitan area. At F.W.'s funeral the boy who had been abused, abandoned, and forgotten and known to few, was mourned by over 400 people including the Governor of New Jersey, a United States Senator and the Mayor of Newark. Richard Lezin Jones, Hundreds Turn Out in Newark to Grieve for A Too-Brief Life, New York Times, January 25, 2003. at B1.[2]
The police and FBI hunt for Sherry Murphy ended after four days. On January 9, 2003, she was found hiding in the Newark apartment of a man she met on the street three days earlier. She was arrested, remanded to jail on charges of child endangerment, and subsequently indicted on seven counts of attempted murder, kidnapping, and child endangerment. Avoiding trial, she pleaded guilty to two counts of aggravated assault, two counts of criminal restraint, and two counts of endangering the welfare of a child. At her plea hearing Murphy said that F.W. died while she was living in Irvington. She hid the body and took it with her when she moved to Newark in December 2002, where she placed it in the basement. She further admitted to confining R.W. and T.H., Jr. in the unlit basement without food, water or a toilet and causing their severe malnutrition. She also admitted to burning the buttocks of four-year-old T.H., Jr. by placing him in scalding bath water and then failing to obtain medical treatment for the injury.
Sherry Murphy was sentenced on November 2, 2005, to an aggregate term of *7 twenty-five years with sixteen years parole ineligibility under the No Early Release Act. Her sentence was affirmed on appeal. Her projected parole eligibility date is August 13, 2016. Murphy's seventeen-year-old son Wesley entered a guilty plea to reckless manslaughter causing the death of F.W. He was paroled on September 2, 2005. Murphy's boyfriend, Joseph Reese, pleaded guilty to sexual assault on R.W. and was sentenced to a five-year term in State prison. He was released on May 31, 2007.
After the discovery of R.W. and T.H., Jr. on January 4, 2003, the Division sought and received an emergency order of temporary custody and supervision of the children pending a factfinding hearing scheduled for February 24, 2003. M.W. was served with the order and a complaint and order to show cause for continued care of R.W. and T.H., Jr. by a Division caseworker while M.W. was in Lincoln Hospital in the Bronx recovering from her injuries in the January 4, 2003 accident. The caseworker reported that M.W. was neither remorseful nor sad. She said that she had not seen her children since August 2001 when she left Sherry Murphy's apartment. She claimed that she made several failed attempts to get R.W., F.W., and T.H., Jr. back, but she did not seek the aid of the police or the Division. She blamed Sherry Murphy for any harm done to her children, but she did not express any anger toward Murphy, referring to her as her favorite cousin.
Following the factfinding hearing on February 24, 2003, Judge Glenn A. Grant found the Division had proven by clear and convincing evidence that M.W. had abused and neglected R.W. and T.H., Jr. by placing them in the care of Sherry Murphy. He directed that the two boys remain in foster care and ordered legal custody was to remain with the Division while alternative placement was explored.
While the Division was pursuing placement, M.W. was discharged from the hospital. She was then arrested in New Jersey on charges she violated the conditions of her probation imposed as a result of a 1996 conviction of child endangerment of children left in her care by a friend serving a prison sentence. M.W. was found guilty of violating probation, and she was sentenced to four years in prison.
R.W. and T.H., Jr. were reluctant to talk to Division caseworkers and others about the abuse they suffered at the hands of Sherry Murphy and their mother. In bits and pieces they disclosed the evil they endured in the Newark basement. R.W. said they had no food and were forced to eat their vomit and drink urine. He added they were tied or shackled by their ankles and wrists. They were burned in hot water and as a consequence were frightened at the sight of a bathtub. R.W. said Murphy burned them with lit cigarettes just like their mother and that Sherry Murphy learned from their mother to burn them as punishment.
It soon came to light that the Division had a long history with M.W. and her family. In 1989 when she was sixteen, M.W. gave birth to her first child, a daughter named K.W.M.W.'s parental rights to K.W. were terminated six years later. In the interim, her first son, F.D.W., was born on May 6, 1991, and the twin boys, R.W. and F.W., were born on June 13, 1995.
The Division's involvement with M.W. and her sons began in 1992 when an anonymous caller reported that the children had no food and that the house was filthy and roach infested. In July. 1996 it was reported that five-year-old F.D.W. and the eleven-month-old twins, R.W. and F.W., were left alone in their apartment without *8 food for several hours and that the mother often left the children alone. When confronted, M.W. admitted to leaving the children by themselves. She signed her first of many case plans with the Division. She failed to complete or cooperate with the Division on any of them.
The Division received another anonymous call on December 4, 1996, this one reporting that drug trafficking was going on in M.W.'s apartment and that her children were left unattended and without proper clothing. The allegations were deemed unsubstantiated. In February 1997, M.W. failed to maintain contact with the Division as required by her case plan. After attempts to locate her were unsuccessful, a request was made by the Division for a hold on her welfare benefits until she contacted the Division. On March 4, 1997, the Division received another referral stating that M.W.'s apartment was filthy with garbage all over the floor, that F.D.W. was begging for food, and all the children were regularly left unattended. A field visit to the home convinced the caseworker that the family was "stable," although the apartment was crowded and unclean.
M.W. signed another case plan on April 2, 1997, agreeing to cooperate with the Division's services. However, five days later on April 7, 1997, the Division sent M.W. a letter stating that after review by the caseworker and her supervisor, it was determined that M.W.'s family no longer required supervision and the Division was closing its case. This decision was both puzzling and disturbing since the Division was well aware that M.W. was indicted three months earlier for child endangerment based on her physical abuse of a friend's children who were left in her care while the mother served a jail sentence. The report made to the Division and the prosecutor was that those children, ages seven, five, and three and a half, were beaten with a belt, a belt buckle, and a coat hanger and burned with lit cigarettes. For some unexplained reason the case was delayed almost five years. On April 2, 2002, M.W. pleaded guilty to second-degree child endangerment, and pursuant to a plea agreement, was sentenced to a five year term of probation.
After closing its case on M.W. and her children in April 1997, the Division was forced to re-open the case on M.W. and her four sons in October 1997, amid further reports of neglect and abuse of the children. M.W.'s resistance to Division supervision continued. She signed five more case plans to cooperate with the Division and its services, but she did the opposite. From October 1997 to December 2001 she moved ten times with her children without notifying the Division. Once again "holds" were requested on her welfare benefits until she and the children were finally located.
Medical neglect was substantiated in 1990 when caseworkers saw that F.D.W. had an untreated laceration on his palm. He was taken to the emergency room where the wound was cleaned and treated, but it was too old to be sutured. Later that year M.W. was referred to the Ad House Newark New Start Project for a psychological evaluation, a drug screening, and pre-natal care since she was four months pregnant with T.H., Jr. But within a month, M.W. again moved without informing the Division. During this time, she gave birth to T.H., Jr. on August 20, 1998.
After several more requests for holds on her welfare benefits, M.W. finally contacted the Division on October 1, 1998 to advise that she was living in East Orange. M.W. was required to sign another case plan on October 7, 1998. She agreed to enroll F.D.W. in school and agreed to attend *9 the Apostles' House Family Preservation Program to learn housekeeping and hygiene skills. But within a month, M.W. told her caseworker that she did not want parent aid services and would not attend. She then disappeared until February 2, 1999, when a Division caseworker saw her on Broad Street in Newark and spoke with her. M.W. said she had moved back to Newark and gave the Division worker the address. But when the caseworker visited the address on February 22, 1999, she was told that M.W. and her children had left and were living with relatives of T.H. On March 8, 1999, T.H.'s relatives informed the Division that M.W. left their apartment on March 1, 1999, with her children and they did not know their whereabouts.
M.W. and the children were located in East Orange on April 27, 1999, after a referral from F.D.W.'s school reporting he had an inch long cut on his thumb and he told the nurse that his mother had cut him with a knife while she was trying to attack her boyfriend and that there was a gun under his bed at home. A worker visited the family that afternoon and decided that the allegations were unsubstantiated. But M.W. was requested to sign another case plan because the school reported that F.D.W. was classified as a nonreader.
On July 28, 1999, the Division was contacted by H.H., the paternal grandmother of T.H., Jr., who said that three weeks earlier M.W. asked her to watch the child one afternoon. M.W. never came back and left no food or clothing for the child. The following day, the Division placed F.D.W., R.W., and F.W. in the care of their maternal aunt, R.G., while T.H., Jr. remained with H.H. During a visit by the caseworker to H.H.'s home on August 19, 1999, H.H. said she still had not seen or heard from M.W. in two months.
Sometime between the end of November 1999 and June 2000, F.D.W., F.W., and R.W. were returned to M.W. She agreed to a psychological evaluation on July 11, 2000. The examining psychologist reported M.W. posed a risk to her children without Division services and parental training. However, M.W. did not complete the recommended parenting skills courses or cooperate with other Division services.
The Division was next notified in August 2000 by R.G., M.W.'s sister in New York, that F.D.W., R.W., and F.W. were living with her. But by late October they were again living with M.W. in New Jersey. Then on January 17, 2001, the Division received an anonymous referral that M.W. and her children were living in an apartment with broken windows and no heat. A caseworker visited the apartment building that day, saw M.W. and the children, and reported the referral as unsubstantiated. This was the last time that anyone from the Division saw any of M.W.'s sons until January 4, 2003, at University Hospital.
After January 17, 2001, the Division again lost contact with M.W. On July 13, 2001, P.W. called the Division to report that F.D.W. was with her in New York and that R.W., F.W. and T.H., Jr. were living with Sherry Murphy while M.W. was serving a county jail sentence. On October 3, 2001, P.W. advised the Division that F.D.W. was now living with her son in New York.[3] She also said that M.W. had *10 been released from jail and was living with her other three sons with Sherry Murphy in Irvington. F.W. informed the caseworker that F.D.W. told her M.W. physically abused her children and burned them with lit cigarettes. On the same day, the caseworker went to Sherry Murphy's home but was told that M.W. and her children did not live there. Three weeks later the caseworker returned to Murphy's home and was told M.W. and the three children were out.
The caseworker then spoke to R.G. in New York who said that M.W. did not properly feed or clothe the children and failed to enroll them in school. She added that M.W. and Sherry Murphy were abusive individuals and that F.D.W. told her both women beat and burned all the children and that Murphy's son tried to sexually abuse him.
Finally, after ten months, the Division successfully made contact with M.W., and a field visit at the Murphy home was scheduled for November 13, 2001. But M.W. called at the last minute to say that she was too busy until after Thanksgiving. The caseworker made an unannounced field visit the following day. Murphy answered the door and said that M.W. and the children were not home and that all of them were doing well. During another unfruitful visit on November 26, 2001, the caseworkers were told by Murphy's brother that M.W. and her children were away for a week. Division caseworkers tried once again on December 10, 2001. As they were walking up the steps, they met a young man who told them that M.W. and her children were inside. But as they approached the front door another man said the caseworkers had "just missed her."
Incredibly, the Division gave up. The following day, December 11, 2001, the decision was made to close the case even though there were reports emanating from F.D.W. that Sherry Murphy and M.W. had physically abused all the boys and the children had not "been seen by a caseworker in a year. The final "In-Home Safety Assessment" prepared by the Division caseworker stated that Sherry Murphy said M.W. and the, children were living with her, that they were "fine," and the children were at "very low risk." The assessment concluded that the children were unlikely to be in danger of immediate or serious harm. The Division "Case Summary for Closing" submitted by the case manager and supervisor based the decision on the non-compliance of M.W. with Division supervision, noting "many attempts to make contact with the children but to no avail." The case was closed.
So the three young boys who were abused by their mother and abandoned by her in the summer of 2001 were again abandoned six months later, this time by the State agency that was supposed to protect them. The Division's next contact was January 4, 2003, following the 9-1-1 call reporting two starving and abused boys of three and seven in a cold, dark basement near the yet to be discovered body of their seven-year-old brother rotting in a plastic bin.
Following the factfinding determination on February 24, 2003, the Division explored relatives of the children for possible placement. When it was reported that no such placement was in the children's best interests, Judge Grant directed the Division to pursue formal guardianship of the children and termination of M.W.'s parental rights. The Division filed its complaint on August 12, 2005.
*11 Meanwhile, while still serving her jail sentence on the probation violation, M.W. filed a civil complaint as guardian ad litem for R.W. and T.H., Jr. against the Division, alleging that the Division had negligently failed to protect her children from abuse while they were in the care of Sherry Murphy. As administrix ad prosequendum she asserted claims for F.W.'s estate under the Wrongful Death Act, N.J.S.A. 2A:31-1, the Survivor's Act, N.J.S.A. 2A:15-3, and for loss of consortium. The State answered denying liability and filed a counterclaim against M.W. seeking expenses incurred in the guardianship action commenced by the Division.
The civil supervising judge recognized a conflict of interest between M.W. and her sons, and appointed a substitute administrix ad prosequendum for the estate of F.W. and separate guardians ad litem for R.W. and T.H., Jr. They participated in mediation with a retired Superior. Court judge, and a settlement was reached between the State and on behalf of the children for payment of $3.75 million on behalf of T.H., Jr., $2.75 million on behalf of R.W. and $1 million to the estate of F.W. The settlement contained no condition or provision that would exclude M.W. from inheriting under the intestacy statute. M.W. did not participate in the negotiations, and her claim of loss of consortium was not included in the settlement. The judge dismissed the count of M.W.'s complaint seeking relief on her own behalf without prejudice, and he specifically stated that M.W. could re-file her claim or claims against the Division in a subsequent action.
A month after the civil settlement was filed, the Division moved in the guardianship action to amend its complaint to include a demand for retroactive termination of M.W.'s parental rights to F.W. including any right of inheritance. The avowed purpose was to prevent M.W. from receiving any portion of the $1 million settlement payable to F.W.'s estate. M.W. opposed the amendment, arguing: (1) the claim asserted in the proposed amendment lacked merit because there is no authority permitting termination of parental rights for a deceased child; (2) any application with respect to M.W.'s interest in F.W.'s estate was a matter for the Probate Division rather than the Family Division; and (3) the Division was vindictively attempting to shift the blame for the death of F.W. to M.W. rather than acknowledging its failures in this case. Following oral argument on April 17, 2006, Judge Grant ruled in favor of the Division, and the amended complaint seeking termination of M.W.'s rights to F.W. was filed the same day.
The guardianship trial began on May 22, 2006, and lasted three days. Psychologist Frank J. Dyer, Division caseworker, Sabrina McNeil, and behavioral therapist, Charles C. Cooper testified for the Division. M.W. did not testify and called no witnesses.
Dr. Dyer testified that in his opinion M.W.'s "contact with reality is rather tenuous [she] has a rather plastic concept of reality." M.W. categorically denied to Dr. Dyer any abusive behavior by her toward any child at any time, even though she pleaded guilty and was sentenced for child endangerment relating to her physical abuse of children placed in her care. She also took no responsibility for the Division's involvement in her life and the life of her children. Dr. Dyer concluded that M.W. suffers from schizophrenia, dysthymic disorder and personality disorders with prominent antisocial features. He said that "[M.W.] is far too unstable emotionally and behaviorally to be even remotely capable of providing the kind of consistent nurturance, structure, guidance and stimulation, and physical protection that a child requires."
*12 Mr. Cooper was qualified as an expert in therapy and behavioral assistance. He testified he saw both R.W. and T.H., Jr. in therapy on a regular basis over an extended period of time. He was adamant that the boys should not have any contact with their mother because they connect the abuse they suffered to their mother. He stated that they had a profound fear of M.W. and regressed emotionally and psychologically when a photograph of her was shown to them. Cooper explained that both children had issues with fear and safety, suffered from night tremors, and were terrified even at the sight of a bathtub. He testified that a close relationship with foster parents was critical in order for the boys to have any chance of developing a sense of normalcy. He said that any relationship between the boys and M.W. would be emotionally traumatic and psychologically disruptive to them.
On June 8, 2006, Judge Grant gave an oral decision terminating the parental rights of M.W. to R.W., T.H., Jr., and the deceased F.W. A week later he issued a comprehensive and insightful eighty-seven page opinion further detailing his findings of fact and legal conclusions.
Judge Grant considered the evidence in light of the four-prong test first enunciated in New Jersey Division of Youth and Family Services v. A.W., 103 N.J. 591, 604-11, 512 A.2d 438 (1986), and codified by the Legislature as the "best interests of the child" standard for termination of parental rights in N.J.S.A. 30:4C-15.1(a).
The division shall initiate a petition to terminate parental rights on the grounds of the best interest of the child if the following standards are met:
(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the Court has considered alternatives to termination of parental rights; and
(4) Termination of parental rights will not do more harm than good.
Noting that the four criteria are not discreet and separate but represent an integrated multi-element test that must be applied to determine whether termination of parental rights is in the best interests of the child, see In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992), Judge Grant found clear and convincing evidence as to each element required for terminating parental rights. With regard to the harm factor, Judge Grant found that M.W.'s instability, transient lifestyle, and periods of incarceration were such that she was unable to provide a safe and nurturing environment for her children. Specific harm inflicted by her included medical neglect, educational neglect, physical abuse, and abandonment of her children. He added that it was M.W.'s failure to assume her parental responsibilities as a caregiver for the children which led to their placement with Sherry Murphy and their subsequent grievous abuse. The fact that M.W. did not or could not comply with the offers of assistance and services by the Division together with her total lack of responsibility to provide for her children and inability to recognize the harm she caused, was testament to the fact that she would continue *13 to endanger the health and safety of her children if permitted to do so, thereby satisfying the second prong of the statutory test.
With regard to the third prong dealing with reasonable efforts by the Division to provide services to assist in correcting the circumstances relating to the danger to the children's safety and health, Judge Grant noted the failure of the Division to help the children when they were living in the home of Sherry Murphy. However, he also found that M.W. failed to perform the normal functions of a parent and was unwilling to accept or pursue the services provided by the Division, which supported the finding of Dr. Dyer that M.W. was psychologically incapable of parenting her children.
Finally, Judge Grant found that the State satisfied the fourth prong by producing clear and convincing proof that the termination of parental rights would not do More harm than good. He found no parent-child bond of R.W. and T.H., Jr. with their mother. On the contrary, he found that the children were afraid of her. He concluded that considering the abuse and neglect that these children suffered, severing the relationship with their mother was essential.
Our review of the record leads us to conclude that the factual findings of Judge Grant are supported by substantial and credible evidence adduced at trial, and his findings amply satisfy all four statutory factors for termination of the parental rights of M.W. to R.W., T.H., Jr., and F.W. under N.J.S.A. 30:4C-15.1. N.J. Div. of Youth & Family Services v. R.L., 388 N.J.Super. 81, 88-89, 906 A.2d 463 (App. Div.2006); see also, Cesare v. Cesare, 154 N.J. 394, 412-13, 713 A.2d 390 (1998); Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). There remains the issue of the legal propriety of a judgment posthumously terminating M.W.'s parental rights to F.W. and whether that judgment proscribes M.W. from inheriting by intestacy the settlement paid by the State.
We have no doubt that the Family Part has jurisdiction to decide the multiple issues in this case. The Family Part is a court of general jurisdiction with power to decide "all civil actions in which the principal claim is unique to and arises out of a family or family-type relationship." R. 5:1-2(a). Our Supreme Court has stated that deference is to be given to the special expertise developed by Family Part judges in dealing with family or family-type matters. Cesare, supra, 154 N.J. at 412-13, 713 A.2d 390. Moreover, probate actions arising out of family relationships or family-type relationships have been previously held cognizable in the Family Part. In re Estate of Roccamonte, 174 N.J. 381, 398-99, 808 A.2d 838 (2002); Kingsdorf v. Kingsdorf 351 N.J.Super. 144, 159, 797 A.2d 206 (App.Div.2002); D'Angelo v. D'Angelo, 208 N.J.Super. 729, 506 A.2d 851 (Ch.Div.1986); Berlin v. Berlin, 200 N.J.Super. 275, 278-79, 491 A.2d 63 (Ch. Div.1984). There was no prejudice to M.W. by having the matter resolved in the Family Part. Indeed, the Division in the guardianship action to terminate parental rights carries the burden of clear and convincing proof to terminate, while the preponderance of evidence standard governs in a probate action. Therefore, we see no reason why the Family Part could not consider the issues concerning the relationship of M.W. with F.W., whether M.W.'s parental rights were properly terminated, and whether her rights of inheritance were extinguished.
We are also unimpressed by M.W.'s argument that the Division' action to terminate M.W.'s parental rights was vindictive or designed to deflect attention from its *14 own negligence in failing to protect F.W. There is no doubt that the Division failed in its duty to these children, and the amount of civil settlement reflects the extent and degree of its failure. However, the Division's failure does not bar consideration of M.W.'s responsibility for the abuse of F.W. and whether she should be excluded from receiving any portion of the settlement amount to F.W.'s estate that is presently held in trust. The Division is charged to act in the best interests of children. Precluding M.W. from obtaining any portion of the settlement would be in the economic interest of F.W.'s siblings, who would then inherit the settlement recovery through intestacy and would also comport with the presumed intent of F.W. While the State did not seek to pursue the issue of M.W.'s responsibility for the death of her son and her right of inheritance during the civil action, there is no reason to foreclose the Division from raising the issues in this proceeding.
There was no error in granting the Division's motion to amend its complaint to permit relating back in time to M.W.'s conduct toward F.W. prior to his death and to determine whether the proofs justified posthumous termination of her parental rights. A motion for leave to amend pleadings is liberally granted, especially in matters affecting the public interest and even when the merits of the claim are uncertain. Notte v. Merchants Mut. Ins. Co., 185 N.J. 490, 500-01, 888 A.2d 464 (2006); Zacharias v. Whatman PLC, 345 N.J.Super. 218, 226, 784 A.2d 741 (App.Div.2001), certif. denied, 171 N.J. 444, 794 A.2d 183 (2002); Kernan v. One Wash. Park Urban Renewal Assocs., 154 N.J. 437, 456-59, 713 A.2d 411 (1998). There was no prejudice to M.W. as the proofs adduced were essentially the same as to all three children. Under the circumstances of this case where the public interest is of great significance, Judge Grant properly exercised his discretion in permitting the amendment to the Division's complaint to seek termination of parental rights, of M.W. to her deceased child.
We next address the larger issue of M.W.'s right to receive F.W.'s settlement recovery and whether any legal or equitable ground precludes her from inheriting F.W.'s estate by intestacy. The civil action resulting in the $1 million settlement was based on this State's Wrongful Death Act, N.J.S.A. 2A:31-1 to 31-6, and Survivor's Act, N.J.S.A. 2A:15-3. Actions to recover damages for the wrongful killing of a child are wholly statutory since no right existed at common law prior to the passage of Lord Campbell's Act. Johnson v. Dobrosky, 187 N.J. 594, 605, 902 A.2d 238 (2006); Negron v. Llarena, 156 N.J. 296, 308, 716 A.2d 1158 (1998). Under this State's Wrongful Death Act, recovery is limited to pecuniary losses, which in the case of a child, is limited to loss of future financial contributions and loss of companionship and care. Green v. Bittner, 85 N.J. 1, 14-15, 424 A.2d 210 (1980). Proceeds of a recovery under the Wrongful Death Act are not part of the decedent's estate. The recovery is for the exclusive benefit of those entitled to take the decedent's personal property by intestacy. Miller v. Estate of Sperling, 166 N.J. 370, 383-84, 766 A.2d 738 (2001); Gershon v. Regency Diving Ctr., 368 N.J.Super. 237, 246, 845 A.2d 720 (App. Div.2004). N.J.S.A. 2A:31-4. In contrast, an action under the Survivor's Act permits recovery of pecuniary and non-pecuniary damages prior to death, but, as with the Wrongful Death Act, recovery belongs to the decedent's estate, which, in the case of a person without a will or a child, passes to those entitled to inherit by intestacy. N.J.S.A. 2A:15-3.
*15 Most state statutes prohibit recovery for wrongful death of a child to a parent who abandons or fails to support the child by denying the parent the right to bring a wrongful death action or share in damages recovered in such an action. See Emile F. Short, Parent's Desertion, Abandonment, or Failure to Support Minor Child as Affecting Right or Measure of Recovery for Wrongful Death of Child, 53 A.L.R.3d 566, 568-69 (1973); see also Allison M. Stemler, Note, Parents Who Abandon or Fail to Support. Their Children and Apportionment of Wrongful Death Damages, 27 Brandeis J. Fam. L. 871 (1989). However, neither the New Jersey Wrongful Death Act nor the Survivor's Act contain an exception to the distribution mandated by the intestacy act. Evidence of mistreatment or abandonment by a parent of a child may bear on future financial contributions to the parent or the loss of companionship and advice to the parent and thereby affect the damage recovery. N.J.S.A. 2A:31-5. However, actions by a parent contrary to the welfare of the child such as desertion, abandonment, or failure to support do not preclude recovery of damages for wrongful death of the child. See In re Rogiers, 396 N.J.Super. 317, 325, 933 A.2d 971 (App.Div.2007); In re Estate of Rozet, 207 N.J.Super. 321, 326, 504 A.2d 145 (Law Div.1985). Compare Johnson, supra, 187 N.J. at 610-11, 902 A.2d 238 with Green, supra, 85 N.J. at 12-17, 424 A.2d 210.
In the absence of a surviving spouse, domestic partner, or surviving descendents, parents are next in line to receive the estate of an intestate child, N.J.S.A. 3B:5-4(b), and siblings inherit only if there are no surviving descendents or parents, N.J.S.A. 3B:5-4(c). Accordingly, absent any exception or exclusion, the intestacy law of this State provides that M.W. is entitled to the entire estate of F.W. to the exclusion of R.W. and T.H., Jr.
Intestacy statutes provide a will for those who have neglected to make their own or, as in this case, are adjudged incompetent. See generally, Ronald J. Scalise, Jr., Honor Thy Father and Mother?: How Intestacy Law Goes Too Far in Protecting Parents, 37 Seton Hall L.Rev. 171 (2006). They are a necessary response to the fact that most Americans die without wills. Id. at 174.[4] The intestacy laws are thought to fulfill the presumed intent of decedent and, alternatively, to embody society's judgment as to how the decedent's property should devolve. Id. at 173; see also Unit: Probate Code, art. II, pt. 1, gen. smt. (1969) (intestate succession "should in the main express what the typical intestate would have wished had he expressed his desires in the form of a will or otherwise"). However, case law has held that where there is no will, the distribution of a decedent's estate must be in accord with the order specified in the intestacy statute even when the decedent expresses a contrary intent. Rozet, supra, 207 N.J.Super. at 326, 504 A.2d 145; Maxwell v. Maxwell, 122 N.J. Eq. 247, 193 A. 719 (Ch.1937) (next of kin take by intestacy is not in pursuance of the testator's intention, but by force of law, regardless of what his intentions were).
For those dissatisfied with distribution by intestacy, the simple answer is to execute a will. But that option is not available to a seven-year-old child. A child is forced to leave property to his or her *16 parents even if the parents are unworthy. If we could consider F.W.'s presumed intent to distribute his $1 million estate, he would in all likelihood mirror the fear and anger that his brothers displayed toward M.W. and elect to exclude her from any inheritance in favor of his brothers. However, our case law interprets the language of N.J.S.A. 3B:5-4 to rule out any judicially created exception to intestacy distribution based on the wishes of the child, even though the child cannot opt out of the default distribution of the intestacy statute. Rogiers, supra, 396 N.J.Super. at 325-26, 933 A.2d 971. Therefore, the intestacy statute does not preclude M.W. from receiving F.W.'s entire estate in spite of any presumed intent of F.W. to the contrary or M.W.'s unworthiness.
The exception to the mandated distribution of the intestacy statute is the "slayer rule," codified in N.J.S.A. 3B:7-1.1, which states that an intentional killer forfeits all benefits from the decedent's estate, whether inherited by will or intestacy. If the victim dies intestate, the estate passes through as if the killer disclaimed his share. The statute codified the common law of this State and the equitable principle that wrongdoers should not be allowed to profit from wrongdoing.[5]See, e.g., Neiman v. Hurff, 11 N.J. 55, 93 A.2d 345 (1952); Wasserman v. Schwartz, 364 N.J.Super. 399, 836 A.2d 828 (Law Div.2001); Estate of Wolyniec v. Moe, 94 N.J.Super. 43, 226 A.2d 743 (Ch.Div.1967); cf. D'Arc v. D'Arc, 175 N.J.Super. 598, 421 A.2d 602 (App.Div.1980), certif. denied, 85 N.J. 487, 427 A.2d 579, cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981) (husband who tried to have wife murdered held not entitled to equitable distribution in divorce action). In this case, however, the slayer rule is inapplicable since both the statute and prior case law require an intentional killing, Estate of Artz v. Artz, 198 N.J.Super. 585, 487 A.2d 1294 (App.Div.1985), and M.W. did not kill her son, although her cruelty and abandonment ultimately led to his death in Sherry Murphy's apartment.
A majority of other states have adopted a statutory exception to the mandatory succession by intestacy statutes applicable to children to extinguish the inheritance rights of "bad parents." Scalise, supra, at 193; see, e.g., N.Y. Est. Powers & Trusts, § 5-1.2(a); Conn. Gen.Stat. Ann. § 45(a)-436(g); N.C. Gen.Stat. § 31A-2 (1984); and 20 Pa. Cons.Stat. § 2106(a). Most of these statutes are directed to parental abandonment and non-support, although several preclude inheritance by a parent who has been convicted of crimes against the child including physical abuse, sexual abuse, and endangering the child's welfare. See, e.g., 20 Pa. Cons.Stat. § 2106(a); see also Or.Rev.Stat. § 112.465 (2005); Scalise, supra, at 102. Furthermore, both the Restatement of Property and the Uniform Probate Code bar inheritance by a parent who has abandoned and refused to support the child. Restatement (Third) of Property: Wills & Other Donative Transfers, § 2.5(5); Unif Probate Code, § 2.114(c), 8 U.L.A. 91 (1998). But New Jersey has no bad parent statute to preclude parental inheritance by intestacy, and it has not adopted the applicable sections of the Restatement of Property or the Uniform Probate Code.
In Rozet, supra, 207 N.J.Super. at 323, 504 A.2d 145, a Law Division decision, the father, who abandoned his daughter six *17 months after her birth and failed to pay any child support, was held entitled to collect his intestate share of her estate. Rozet was recently cited with approval by another panel in Rogiers, supra, 396 N.J.Super. at 324-25, 933 A.2d 971. In that case the child was severely handicapped from birth as a result of medical malpractice. Her mother pursued the malpractice claim and obtained a substantial recovery that was placed in trust for the daughter. When the child died, her father sought half of the trust balance of over $1 million as his intestate share. The mother argued that he did not contribute to the child's support and therefore did not qualify as her parent and should not receive any part of the child's estate. The court rejected the argument, holding the father was qualified as a parent under the Parentage Act, N.J.S.A. 3B:5-10, and the requisite legal relationship qualified him to inherit as a parent through intestacy. The court further rejected the claim that the New Jersey Probate Code should be read to include the portion of the Uniform Probate Code section that prohibits inheritance when the parent supports the child. But the court found the argument was without substance, noting that the Legislature had amended the Probate Code twice since Rozet and had not adopted the provision.
We must conclude that with the exception of the slayer rule, the intestacy law of this State is blind to the worthiness of a parent inheriting from a deceased child. Accordingly, M.W. has an enforceable legal right to inherit the entire $1 million in F.W.'s estate despite factual findings of cruel and abusive conduct toward her son unless her parental rights are terminated in a Title 30 action or there are other lawful grounds to interdict her from receiving the inheritance.
M.W. argues that her parental relationship terminated on the death of F.W. and that therefore no cause of action, could lawfully exist under Title 30. However, under the decisional law of this State, a court may exercise equitable powers in unusual circumstances to grant posthumous relief in order to prevent an inequity.
So, in In re Estate of Santolino, 384 N.J.Super. 567, 895 A.2d 506 (Ch.Div. 2005), the issue was whether the court could annul a marriage after the death of one of the parties to the marriage. There, the eighty-one year old decedent suffering from terminal lung cancer married a forty-six year old woman one month before he died intestate. The decedent's sister filed a caveat against granting letters of administration, contending that the marriage was a nullity. The widow argued that the validity of the marriage could not be challenged because the decedent's death terminated the marriage. The court held that under its equitable powers the validity of the marriage could be addressed after the decedent's death because "[a] court of equity is empowered to prevent one party from acquiring the benefits of marriage when the marriage itself was somehow illicit." Id. at 584, 895 A.2d 506. See also Carr v. Carr, 120 N.J. 336, 576 A.2d 872 (1990) (holding that when the husband died during the pendency of a divorce action, the wife may pursue a claim for equitable distribution); Fulton v. Fulton, 204 N.J.Super. 544, 499 A.2d 542 (Ch.Div.1985) (holding that final judgment of divorce could be adjudicated after husband's death based on prior testimony in order to prevent inequity to decedent's children); Jacobson v. Jacobson, 146 N.J.Super. 491, 370 A.2d 65 (Ch.Div.1976) (after husband charged with wife's murder, court declined to abate divorce action and substituted wife's estate as a party for purposes of *18 equitable distribution). These cases stand for the proposition that in exceptional circumstances a court may apply principles of equity to posthumously grant relief from the plain reading of a statute based on the equitable principle that no one should be allowed to profit directly or indirectly from his own wrongdoing, a principle described by our Supreme Court as "so essential to the observance of morality and justice [that it] has been universally recognized in the basis of civilized communities for centuries and is as old as equity. Its sentiment is ageless." Neiman, supra, 11 N.J. at 60-61, 93 A.2d 345.
While the guardianship statute contemplates a surviving child, N.J.S.A. 30:4C-15(a), there is no limitation on a court's posthumous application of the statute. See Santolino, supra, 384 N.J.Super. at 583, 895 A.2d 506 (noting that the annulment statute did not express limitation upon its posthumous application). We agree with Judge Grant that the unique and extraordinary circumstances of this case are such that the Family Court in the exercise of its equitable powers may terminate M.W.'s rights to inherit from F.W. nunc pro tunc. The clear public policy of this State is to protect and preserve the welfare of its children, and, to this end, there is reposed in the Family Court inherent equitable authority to fashion appropriate remedies to protect the welfare of children and advance their best interests. In re Adoption of a Child by WP., 163 N.J. 158, 195, 748 A.2d 515 (2000); In re Guardianship of J.C., 129 N.J. 1, 10, 608 A.2d 1312 (1992). Commenting on excluding a right to inherit by a terminated parent, Professor Brown wrote:
[I]t seems unjust to allow parents whose rights have been terminated because of the parents' physical or sexual abuse of their children to benefit from their relationship with the children that they have treated reprehensibly. While it is difficult, and perhaps impossible, to accurately estimate the presumed testamentary intention of children of terminated parents, in the case of seriously abusive parents, it does not seem inappropriate to substitute our societal judgment that such parents should not inherit from the child when the child dies before reaching the age of legal capacity to execute a will.
[Richard Lewis Brown, Undeserving Heirs?The Case of the "Terminated" Parent, 40 U. Rich. L.Rev. 547, 587 (2006).]
How cruel, ironic, and inequitable it would be to hold that M.W. retained the right to inherit $1 million from the child she burned, abused, neglected, and abandoned. Equity, morality, and common sense dictate that physically or sexually abusive parents have no right of inheritance by intestacy. The contrary result would bespeak a thoughtless jurisprudence warranting public disrespect. The applicable principle of equity is that "equity will not suffer a wrong without a remedy." Crane v. Bielski, 15 N.J. 342, 349, 104 A.2d 651 (1954). In these extraordinary circumstances, the inherent equitable powers of the Family Part prevents the unjust enrichment of M.W. which would result from the mechanical application of the intestacy statute.
Our courts have declined to apply statutes leading to an unjust result in other cases. In Carr, supra, 120 N.J. at 336, 576 A.2d 872, the husband died during the pendency of the divorce action, and his will left his entire estate to his children of a prior marriage. Since the applicable statute, N.J.S.A. 2A:39-25, did not authorize equitable distribution without a judgment of divorce, the husband's death terminated the wife's claim under the plain language of the statute. Furthermore, the wife had *19 no claim for an elective share of her husband's estate because N.J.S.A. 3B:8-1 excluded a surviving spouse living separate and apart from the decedent at the time of death. Application of the two statutes put the wife in a "black hole" without recourse to any properly acquired during the marriage. The Supreme Court found that:
[T]he principle that animates both statutes is that a spouse may acquire an interest in marital property by virtue of the mutuality of efforts during marriage that contribute to the creation, acquisition, and preservation of such property. This principle, primarily equitable in nature, is derived from notions of fairness, common decency and good faith. Further, we are convinced that these laws do not reflect a legislative intent to extinguish the property-entitlements of a spouse who finds himself or herself beyond the reach of either statute because the marriage has realistically but not legally ended at the time of the other's death.
[Id. at 349-50, 576 A.2d 872.]
The Court thus molded the equitable distribution statute to reflect its public policy determination that marital property did not lose its distinctive nature with the death of one spouse during a divorce proceeding and permitted the wife to amend her complaint to seek equitable relief through imposition of a constructive trust and to assert a cause of action in quasi-contract.
As guidance to future court action, the Supreme. Court stated:
In the exercise of their common-law jurisdiction, courts should seek to effectuate sound public policy and mold the law to embody the societal values that are exemplified by such public policy. In this process, courts should be responsive to legislation as expressive of public policy, which can serve to shape and add content to the common law, even though such legislative expressions may not be directly applicable or binding in the given matter.
[Id. at 350, 576 A.2d 872 (citation omitted).]
Similarly, Chief Justice Wilentz stated: "Our Court has been working to make sure the common law corresponds to present societal values." Joseph F. Sullivan, New Jersey Seen as Leader on Rights, N.Y. Times, July 18, 1990 at B1 (quoted in Ann-Marie Rhodes, Abandoning Parents Under Intestacy, Where We Are, Where We Need to Go, 27 Ind. L.Rev. 517, 526, f.35 (1990)). Absent clear legislative intent to the contrary, statutes are to be interpreted consistent with societal aims and values, and invocation of equitable remedies afford relief from an unjust result that is contrary to the public policy underlying the legislation. A court's authority to so act was also recognized in Untermann v. Untermann, 19 N.J. 507, 518, 117 A.2d 599 (1955), in which the Court stated, "Equities arise and stem from facts which call for relief from strict legal effects of given situations." Id. at 518, 117 A.2d 599. In an early slayer case authored by Chief Justice Vanderbilt, the Court stated:
It would be a strange system of jurisprudence that would be able to grant relief against many kinds of accidents, mistake and fraud, by compelling a defendant to act as constructive trustee with respect to property vouchsafed him by the common law, and yet be unable similarly to touch the legal rights of a defendant who sought to profit by a heinous crime.
[Neiman, supra, 11 N.J. at 61, 93 A.2d 345.]
Alternatively, a constructive trust is an appropriate equitable remedy to undo *20 an unjust result from the strict application of a statute to cause unjust enrichment. Carr, supra, 120 N.J. at 351-52, 576 A.2d 872; D'Ippolito v. Castoro, 51 N.J. 584, 588-89, 242 A.2d 617 (1968). In such cases the person who wrongfully receives the property is converted into a constructive trustee with a duty to convey the property to the rightful person or persons. Jesse Dukemintee and Stanley M. Johanson, Wills, Trust and Estates, 460 (4th ed.1990). Best described by Justice Cardozo,
A constructive trust is the formula through which the conscience of equity finds expressions. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience return the beneficial interest, equity converts him into a trustee.
[Beatty v. Guggenheim Exploration Co., 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919).]
Generally, imposition of a constructive trust involves a wrongful act which results in an unjust enrichment. D'Ippolito supra, 51 N.J. at 588, 242 A.2d 617. In Carr, supra, the acquisition of property by the decedent's children was not wrongful and was in accord with the Wills Act, 120 N.J. at 336, 576 A.2d 872. But the wife suffered a wrong by the mechanical application of the equitable distribution statute without regard to its underlying policy. In this case, the "wrong" was the cruel and abusive treatment of F.W. by his mother compounded by her unjust entitlement by the intestacy statute to the $1 million recovery from the State.
There is an obvious analogy between this case and the slayer cases, as they share the same ethical ground. Prior to the 2004 statute, a constructive trust was the favored device in such cases to prevent inheritance by the murderous heir. See, e.g., Small v. Rockfeld, 66 N.J. 231, 245, 330 A.2d 335 (1974); Hirsch v. The Travelers Ins. Co., 134 N.J.Super. 466, 470-71, 341 A.2d 691 (App.Div.1975); DeSena v. Prudential Ins. Co., 117 N.J.Super. 235, 242, 284 A.2d 363 (App.Div.1971); In re Estate of Kalfus v. Kalfus, 81 N.J.Super. 435, 437-39, 195 A.2d 903 (Ch.Div.1963) (Pashman, J.). The imposition of a constructive trust in this unusual case does no violence to the intestacy default rules. Instead, it recognizes that since a grievously abused child such as F.W. cannot opt out of the intestacy default rules favoring the abuser, equity must afford relief from that cruel and unjust result.[6]
We therefore affirm the judgment by Judge Grant and hold that in these extraordinary circumstances the parental rights of M.W., including any residual right of inheritance, were terminated pursuant to N.J.S.A. 30:4C-15.1. Concurrently, we hold that equitable principles inherent in the Family Court proscribe the recovery or receipt of any portion of F.W.'s estate by M.W., thereby causing her disinheritance, and we impose a constructive trust on F.W.'s gestate with the direction that the funds are to be conveyed to F.W.'s brothers as proper recipients under the intestacy succession rules.
Affirmed.
NOTES
[1] Another son, F.D.W., born on May 6, 1991, was not the subject of this termination proceeding.
[2] F.W. was the first one of thirty-one children who died in 2003 as a result of abuse or neglect, according to Division records. For insight into this terrible problem, see Mark Parent, Turning Stones: My. Days and Nights with Children at Risk: A Caseworker's Story, Harcourt Brace & Co., 1996. ("[T]he person you keep running into, when you see the bruises and the cigarette burns and hear the wails, is yourself." From. Foreword by Anna Quindlen.)
[3] Subsequently, F.D.W. was committed to the Bronx Psychiatric Hospital. He has been under the supervision of the Association of Children's Society since 2003 and was placed in the legal custody of Children's Services of New York. At last report, F.D.W. was living at a residential treatment center in White Plains. An action to terminate M.W.'s parental rights to F.D.W. was pending in New York Family Court. An amicus curiae brief has been filed on his behalf in this appeal in support of affirmance of Judge Grant's judgment.
[4] Fewer still are aware of the contents of intestacy laws. One study in 1976 of residents of Morris County, New Jersey revealed that fourteen percent of the sample did not know of the existence of intestate inheritance and believed that the government received the intestate decedent's property. Joel R. Glucksman, Intestate Succession in New Jersey: Does it Conform to Popular Expectations, 12 Colum. J.L. & Soc. Probs. 253, 276 (1976).
[5] The equitable maxim is "nullus commodum capere potest de injuria sua propria" (no one shall take advantage of his own wrong). See generally Jeffrey G. Sherman, Mercy Killing and the Right to Inherit, 61 Cin. L.Rev. 803, 844-56 (1993), for an overview of state slayer statutes.
[6] To the extent that Rogiers, supra, 396 N.J.Super. at 317, 933 A.2d 971, and Rozet, supra, 207 N.J.Super. at 321, 504 A.2d 145, are read to indicate a contrary result, we decline to follow those cases.