# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5254-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

C.W.H.[1]

    Defendant-Respondent.

_____

<div style="border:1px solid black">

**APPROVED FOR PUBLICATION**

**January 15 , 2021**

**APPELLATE DIVISION**

</div>

Argued November 9, 2020 – Decided  January 15, 2021

Before Judges Sabatino, Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 16-07-0617.

Elizabeth C. Jarit, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Elizabeth C. Jarit and Rochelle Watson, Deputy Public Defender II, of counsel and on the briefs).

Andre R. Araujo, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Andre R. Araujo, of counsel and on the brief).

---

[1] We use initials to protect the confidentiality of the victim.  R. 1:38-3(c)(12).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Following a jury trial, defendant was convicted of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), and two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b), stemming from the sexual abuse of his daughter, S.H., from the time she was five to the time she was twelve years old. The abuse consisted of an act of fellatio and weekly acts of sexual contact. S.H. reported the abuse to police in 2015, when she was thirty-one years old. During the ensuing protracted police interrogation, defendant admitted "lay[ing] on top of [S.H.]" twice at nighttime while they were both wearing pajamas "to give her extra affection." After repeatedly denying the allegation, defendant also ultimately admitted to an act of penetration but did not "remember the incident," and was relying on the fact that S.H. had said "it happened."

Five years earlier, in 2010, for the first time, S.H. had disclosed the abuse to her husband and confronted defendant by email. The following year, in 2011, S.H. disclosed the abuse to her brother and his wife, V.H., who testified at trial that the disclosure seemed credible to her because of defendant's "weird vibes" and her "intuition." During the trial, defendant did not testify but produced eight character witnesses who testified about his

impeccable reputation in the community. Following the verdict, defendant was sentenced to an aggregate term of twenty-four years' imprisonment, community supervision for life, N.J.S.A. 2C:43-6.4,[2] and ordered to comply with the registration requirements of Megan's Law, N.J.S.A. 2C:7-2.

On appeal, defendant raises the following points for our consideration:

POINT I

THE INTERROGATING DETECTIVE USURPED THE JURY'S ROLE AS ARBITER OF CREDIBILITY AND DEPRIVED DEFENDANT OF A FAIR TRIAL BY REPEATEDLY ASSERTING DURING THE INTERROGATION THAT DEFENDANT'S DENIAL OF THE ALLEGATIONS WERE LIES AND BY OFFERING HIS OPINION AS TO DEFENDANT'S TRUTHFULNESS AT TRIAL. (PARTIALLY RAISED BELOW).

POINT II

[V.H.'S] INADMISSIBLE HEARSAY TESTIMONY THAT THE VICTIM DISCLOSED THE ALLEGATION OF ABUSE SIXTEEN YEARS AFTER THE FACT PREJUDICED DEFENDANT'S RIGHT TO A FAIR TRIAL; THE PREJUDICE WAS EXACERBATED BY [V.H.'S] IMPROPER COMMENT THAT THE ALLEGATION WAS TRUE BASED ON HER "INTUITION," HAVING SPENT TIME WITH DEFENDANT. (NOT RAISED BELOW).

---

[2] N.J.S.A. 2C:43-6.4 was amended by L. 2003, c. 267, § 1 effective January 14, 2004. The amendment included the title change from Community Supervision for Life (CSL) to Parole Supervision for Life (PSL). Because these offenses predated the amendment, defendant was sentenced to CSL.

<u>POINT III</u>

THE PROSECUTOR'S CROSS-EXAMINATION OF EACH OF DEFENDANT'S CHARACTER WITNESSES WITH SPECIFIC INSTANCES OF CONDUCT VIOLATED THE RULES OF EVIDENCE AND PRESUPPOSED HIS GUILT OF THE UNDERLYING CHARGES, THEREBY PREJUDICING DEFENDANT'S RIGHT TO [A] FAIR TRIAL. (NOT RAISED BELOW).

Because we agree that defendant was deprived of a fair trial in multiple ways, we reverse.

## I.

We glean the following facts from the trial record. S.H., born October 1983, lived with defendant, her mother, and her younger brother in Pittsgrove Township until 1992, when the family moved to Vineland. S.H. testified that in 1988, when she was five years old, defendant made her perform fellatio on him while she and defendant were home alone in defendant's bedroom in the Pittsgrove home. According to S.H., during the incident, defendant "exposed his penis[,] . . . grabbed [a] condom off . . . the night stand[,] . . . put [the] condom on," and "told [S.H.] to give [his penis] a kiss." S.H. testified that she "put [defendant's penis] in [her] mouth . . . [a]s far as it could go[,] . . . [went] up and down" as defendant instructed, and, after "a couple of moments," defendant "grunted . . . and was done." Afterwards, S.H. left the bedroom.

4

S.H. testified that over the next several years, acts of sexual abuse occurred at the Pittsgrove home about "[o]nce a week, if not more." During the incidents, while S.H. and defendant were home alone lying "on the couch . . . watching [television]" in "the spoon[] position," defendant "would dry hump [her]" by "rub[bing] his [erect] penis against [her] backside" while saying "do you like that," or "how does that feel." After the family moved to Vineland, defendant continued the sexual abuse, though the location moved from the couch to S.H.'s bedroom. During those incidents, defendant would "roll [S.H.] over" onto "[her] back" and "climb into bed . . . on top of [her]." Defendant would then "rub his penis against [S.H.'s] vagina," asking "do you like that," or "how does that feel," until he "ejaculate[ed] inside of his underwear."[3] On one occasion, S.H. refused to move when defendant tried to roll her over, so defendant "rub[bed] his penis against [her] backside" instead.[4] In another incident, when S.H. was approximately ten years old, defendant French kissed her by "[sticking] his tongue in [her] mouth[] and [telling her] to move [her] tongue around."

---

[3] Although S.H. denied any vaginal penetration, she recalled one incident "on the couch in the living[] room" of the Vineland house during which defendant "touched [her] vagina . . . over [her] clothing."

[4] S.H. testified that generally, both she and defendant were wearing underwear during the incidents. However, on one occasion, defendant "pulled . . . his penis out" and placed it directly "against [her] backside."

S.H. testified that the Vineland incidents usually occurred between 6:00 a.m. and 6:30 a.m. before defendant left for work. According to S.H., although her mother and brother were normally present in the home during the incidents, neither was aware of the abuse. While the abuse was ongoing, S.H. never told anyone because defendant "told [her] not to" and "[she] was afraid that [she] would lose [her] family and would [not] be believed" if she revealed the abuse to her family or anyone else. S.H. added that because the abuse made her feel "[d]irty, ashamed, [and] scared," she "did [not] say anything to anybody" because "[i]t just [made her] feel like [she] did something wrong." Despite the abuse, which continued until "a little before [S.H.'s] thirteenth birthday," S.H. stated that the family appeared "[f]rom the outside" to be "very normal [looking]."

S.H. "graduated [from] high school in 2002," "married [in] . . . 2004," and "joined the military in 2005." As an adult, she maintained a relationship with defendant until approximately 2010. At that time, S.H. began having marital and "personal problems." As a result, she disclosed the abuse to her husband and, for "[c]losure," confronted defendant in an email. S.H. testified that although defendant responded by email,[5] and admitted that he was only

_____

[5] The emails were not introduced at trial.

"giving [her] extra love," he did not apologize.  Consequently, S.H. stopped talking to her parents and went "on with life."  The following year, 2011, S.H. was "medically discharged" from the military due to complications from surgery and moved to Pennsylvania to be "closer to home."  When she learned that defendant had been telling "a completely different story," thereby causing a rift in the family, S.H. decided to disclose the abuse to her brother and his wife, V.H., at S.H.'s Pennsylvania home.  The disclosure prompted S.H.'s brother and sister-in-law to convene a family meeting with S.H.'s parents, during which defendant reportedly made incriminating statements.

On July 14, 2015, S.H. reported the abuse to the police and gave a formal statement to State Police Detective Mark Beardsley the following day. After interviewing S.H.'s brother and sister-in-law, at approximately 9:00 a.m. on July 21, 2015, Beardsley went to defendant's residence and requested that he come to the police station for an interview.  Once defendant agreed, Beardsley transported defendant to the police station accompanied by Captain C.J. Tortella.  Upon arrival, defendant was escorted to an interview room and administered his Miranda[6] rights.  After voluntarily waiving his rights,

---

[6]  Miranda v. Arizona, 384 U.S. 436 (1966).

defendant gave an incriminating video-recorded statement,[7] after which he was arrested and charged.

During the four-day trial, in addition to S.H.'s testimony, the State's case-in-chief rested entirely on defendant's recorded statement, as well as the testimony of Detective Beardsley and S.H.'s sister-in-law, V.H. Beardsley explained in detail his training and experience conducting interrogations and dissected the interview process for the jury's benefit. During his testimony, Beardsley also evaluated and assessed defendant's statement after the statement was played for the jury. V.H. testified about S.H.'s disclosure to her, her "intuition" about defendant, and defendant's incriminating statements at the family meeting. According to V.H., during the family meeting convened the day after S.H.'s disclosure, defendant told her and her husband that "he had done something that he knew was wrong and inappropriate," and that he "should not have done it." Defendant further explained "that he was just trying to love [S.H.] more, and it [was] not like he was a molester or anything." Defendant also expressed concern "if it got out to the rest of the family" and the impact on "his job because he was a corrections officer at the time."

After the State rested, the judge denied defendant's motion for a judgment of acquittal. R. 3:18-1. Defendant did not testify at trial but

---

[7] Both Beardsley and Tortella conducted the interrogation.

produced eight character witnesses consisting primarily of family members who testified on his behalf. Following the jury verdict, the judge denied defendant's motion for a new trial, R. 3:20-1, and, after sentencing defendant, entered a memorializing judgment of conviction on June 28, 2018. This appeal followed.

## II.

In Point I, defendant argues that "admitting defendant's interrogation at trial - replete with [Beardsley's] statements attacking [defendant's] denials as lies - was prejudicial." Additionally, defendant argues that Beardsley's testimony during the trial, both before and after defendant's interrogation was played for the jury, "deprived [him] of a fair trial" by virtue of Beardsley's inappropriate comments on defendant's veracity. Specifically, defendant asserts that Beardsley provided "inadmissible lay opinion testimony about defendant's credibility" based on Beardsley's "training and . . . experience conducting interrogations." In so doing, defendant argues that Beardsley effectively "usurp[ed] the jury's role as the sole arbiter" of credibility.[8]

At trial, Detective Beardsley, an eleven-year veteran of the New Jersey State Police, testified that he had investigated "probably hundreds" of sexual

---

[8] Defendant does not challenge the judge's pre-trial ruling admitting his statement at trial as elicited following a knowing and voluntary waiver of his Miranda rights.

assaults during his career. He stated he had been trained in conducting investigations, particularly interviewing suspects, victims, and witnesses. He testified that he had received specialized training on "tactical interviewing" and "statement analysis." Based on his training and experience, he explained that an interview consisted of an "interview phase," during which he gathered "background" information to "try to develop a rapport," as well as an "interrogation phase," during which he would "actually accuse [the suspect] of the crime, if [he] believe[d] that they actually may have been involved . . . in it."

Beardsley elaborated that during the interview,

> [u]sually you're looking for indicators of truthfulness and deceptiveness. You want to try to find out facts that aren't matching up. You know something is true, and they're not saying it's true, it's kind of deceptive, kind of looking for signs of deceptiveness. You look at body language, you look at eye contact. You look at their denials, if they have weak denials. If their denials are strong, . . . you could consider them to be more innocent. You put the whole package together and then you . . . decide, based upon everything.

He further explained that

> if I believe their denials are weak, I'm going to keep . . . continually asking them maybe the same question over and over again. If their answers . . . don't make sense, I'm going to . . . continue[,] . . . if they say they can't remember something, I can't just walk away and . . . just leave the interview room. I have to . . . do my job, I have to

10

follow up. If answers don't make sense, I have to follow up and try to get the truth.

After eliciting Beardsley's background, the prosecuting attorney played defendant's video-recorded statement in its entirety for the jury.[9] Early in the interview, while providing background information, including the names of his children, defendant began crying and stated that he had not spoken to S.H. in four years because she had "accused [him] of something happening in the past and she didn't want anything to do with [him] anymore." Defendant specified that S.H. had accused him of "touching her inappropriately" but explained that all he had ever done was "lay[] on top of her . . . rubbing on her" while he "was on top of the covers" and "she was laying in bed . . . under [the] covers." Defendant stated that S.H. "was on her stomach" while he laid against her back, and both he and S.H. were wearing "pajamas . . . because it was at nighttime." Defendant estimated that these acts occurred "[a] couple of times . . . at the Vineland house" about "[twenty] years ago" when S.H. was "[p]ossibly nine or ten [years old]."

When asked whether his private area was rubbing against S.H. during the contact, defendant replied "[i]t might have been," but he "[did not] recall." When challenged about his purported inability to recall, defendant

---

[9] Both counsel had previously agreed to certain redactions to the statement.

acknowledged that it was "not out of the realm of possibility" but explained that he was "[j]ust . . . try[ing] to give her extra affection because [he] loved her, and . . . still . . . love[d] her." When asked if he ever ejaculated while "rubbing up on [S.H.]," defendant responded that he did not. When grilled about his denials, defendant replied repeatedly that he did not "think so" and said he "did [not] do anything like that." Defendant elaborated that he "never . . . did any penetration or anything [like] that" and reiterated it "was always . . . on top of the covers." Defendant also denied that "anything further" happened and expressly denied engaging in "oral sex" with S.H.

During prolonged questioning about the occurrence of additional sexual acts and amidst accusations by the detectives that defendant was not being "honest" or "truthful" with his answers, defendant continuously denied any further acts and maintained that all he did was "come in [S.H.'s] room at nighttime, and lay on top of her, and hug her, maybe caress her." Defendant explained that at the time, he was "a new father." However, with "more experience[]" and working as a corrections officer, he came to "realize" that laying "on top of [S.H.]" was "inappropriate with a father and daughter." After approximately two-and-one-half-hours of questioning, defendant's denials persisted. Ultimately, after repeated questioning about the oral sex incident, defendant stated that he did not "remember it ever happening, but if [his]

daughter is saying it did, then-."  Defendant speculated that "[m]aybe [his] memory [was] blocking [him]" from remembering.

After Beardsley implored defendant to give an unequivocal yes or no answer as to whether he had oral sex with his daughter, defendant eventually stated "I guess it happened."  The following exchange then occurred:

[Beardsley]: No, not I guess.  It happened, correct?

[Defendant]: Yes.

[Beardsley]: One time, just that one time or . . . .

[Defendant]: One time.

[Tortella]: And why did it stop at that point?  Why didn't it happen again?

[Defendant]: I realized it was wrong.

[Tortella]: And what was the purpose for the condom?

        . . . .

[Defendant]: I don't know.  I don't remember the incident, but . . . .

[Tortella]: [Y]ou don't remember wearing a condom, or you don't remember the incident? . . . .

[Defendant]: I don't remember.

[Tortella]: Yes, you do.

[Defendant]: [S.H. is] saying I did, then I'm trusting her.

13

Defendant later reiterated that "[i]f [S.H.] said that I did it, then . . . I guess I did. But I don't recall any . . . circumstances on [sic] the incident." When asked again to confirm whether the incident occurred, defendant responded "[y]es, one time." However, defendant maintained that he did not "remember any details" such as S.H.'s age or the house they were living in at the time of the incident.

Earlier in the interrogation, when questioned about the French kiss, defendant had also stated that "[i]f [S.H.] says I did, then maybe I did. I don't know. I kissed her a million times." Defendant explained "[i]f I had done it, it might have been an automatic reflex or something when I kissed her." When asked if "[i]t could have happened," defendant replied "[i]t's a possibility it could have happened, but not intentionally."

After playing defendant's recorded statement for the jury, the prosecuting attorney asked Beardsley to explain why he and Tortella did most of the talking during the interview. Beardsley responded:

> It's . . . very normal because of the fact that most of [defendant's] denials, if you can even call them that, were very weak; they are some of the weakest denials I've seen in an interview. We try to alleviate . . . the burden of trying to admit something that's so . . . difficult for him to admit, provide him with opportunities, we keep asking the same question.
>
> His denials were extremely weak, things like I can't remember, I don't know. To me, when I hear "I

A-5254-17T1

don't know," it means that he does know, he just isn't ready to admit it. It's one step closer to providing the truth.

. . . .

[T]his is actually a textbook interview of somebody being deceptive throughout the whole, entire interview. He's not answering questions . . . . He's answering saying I don't remember, I can't recall, I don't recall. That's not what an innocent person says. An innocent person says no, never, that never happened.

Before Beardsley completed his response, the judge interrupted the questioning and, sua sponte, provided the following curative instruction to the jury:

You are the sole deciders of who's telling the truth and who's not telling the truth . . . . You are to completely disregard the trooper's testimony about . . . who he thinks is telling the truth and who is not telling the truth. That is your job . . . .

Now I understand the trooper was explaining his answer, but . . . I'm telling you to strike from your memory all of those statements. You decide who's telling the truth [or] not – you saw the statements being made. You decide those things . . . .

[Y]ou decide who's telling the truth or not, and nobody else decides that. That's your job, and only your job. So, to the extent that you heard any of those

statements about how you figure out who's telling the truth or not, I want you to disregard those.[10]

After resuming direct examination, the prosecuting attorney again asked Beardsley why he asked defendant "certain questions over and over again" during the interview. Beardsley responded:

> Again, just because his denials . . . were very weak. It didn't make sense. I think at one point he mentioned Alzheimer's Disease. He made no mention of Alzheimer's Disease[] when I asked him if he had any ailments in the beginning of the questioning. Just none of his answers - - I don't know, I don't recall, . . . I can't leave that as an answer and be satisfied with that. I wouldn't have a job as a detective. I have to elaborate on that.

When the prosecuting attorney asked whether the repeated questioning was "a typical technique," Beardsley reiterated "[i]f they're weak denials, absolutely."

During re-direct examination, Beardsley restated that based on his training and experience, certain cues that indicated deceptiveness included "[w]eak denials, lack of eye contact, belching, sweating, [and] crying." He confirmed that defendant was "belching" during the interview and explained that it was "just one factor of deceptiveness in not being able to control your bodily functions, when you're asked . . . an important question." There was no

---

[10] Before giving the instruction, the judge informed both counsel at sidebar of his intention to strike the testimony, to which defense counsel agreed.

objection to Beardsley's testimony, and no further curative instruction was requested or given by the judge sua sponte.

Turning to the governing principles, "credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance."  State v. J.Q., 252 N.J. Super. 11, 39 (App. Div. 1991).  Indeed, "the mere assessment of another witness's credibility is prohibited."  State v. Frisby, 174 N.J. 583, 594 (2002).  In particular, a witness should never "offer an opinion that a defendant's statement is a lie" and

> [p]olice testimony concerning a defendant's guilt or veracity is particularly prejudicial because "[a] jury may be inclined to accord special respect to such a witness," and where that witness's testimony goes "to the heart of the case," deference by the jury could lead it to "ascribe[] almost determinative significance to [the officer's] opinion."
>
> [State v. Tung, 460 N.J. Super. 75, 102 (App. Div. 2019) (alterations in original) (quoting Neno v. Clinton, 167 N.J. 573, 586-87 (2001)).]

While lay opinion testimony may be admitted under N.J.R.E. 701 "in the form of opinions or inferences" if "it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue," the rule is not unbounded.  Our courts have not permitted lay opinion testimony "on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion."

State v. McLean, 205 N.J. 438, 459 (2011) (alterations in original) (quoting Brindley Fireman's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). Additionally, witnesses may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out" or "express a view on the ultimate question of guilt or innocence." Id. at 461.

For interrogating police officers, "observations that [a] defendant appeared aggravated . . . and was 'clearly upset' . . . were . . . opinions based on first-hand perception of defendant's appearance, demeanor, and reactions, which fall within the lay opinion rule." Tung, 460 N.J. Super. at 101. However, an "[officer's] opinions as to defendant's truthfulness and guilt . . . [are] not admissible as either demeanor evidence or lay opinion." Ibid. Notably, in Tung, where we reversed the defendant's "convictions for murder of his estranged wife's lover," id. at 80, among other things, we found "[m]ost troubling" a police officer's "comments on the manner in which defendant gave responses" while being interrogated, which "suggest[ed] that [the officer's] own experience and specialized training enabled him to determine that defendant was lying." Id. at 103. There, "[d]uring his live testimony," the officer "stressed to the jury" that, when questioned, the "defendant's responses were 'vague' but 'not denials,' while an honest person would have answered 'no,

absolutely not.'" Ibid. We concluded that "[t]he testimony . . . was improper" because "[t]he overall message," which was "exacerbated" by "[t]he absence of a video recording of the interrogation"[11] was that the officer "could tell that defendant was lying." Id. at 103-04.

Here, because the objection to Beardsley's testimony is being lodged for the first time on appeal, we review for plain error. State v. Macon, 57 N.J. 325, 333 (1971). Under that standard of review, we disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

It is beyond cavil that "[p]lain error is a high bar." State v. Santamaria, 236 N.J. 390, 404 (2019). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Ibid. (quoting State v. Bueso, 225 N.J. 193, 203 (2016)).

> A defendant who does not raise an issue before a trial
> court bears the burden of establishing that the trial

---

[11] Only an audio recording of the interrogation and a transcript of the statement were presented to the jury at trial. Id. at 89-90.

court's actions constituted plain error because to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.

[Id. at 404-05 (alteration in original) (citation omitted).]

Accord State v. Trinidad, 241 N.J. 425, 445 (2020).

Here, Beardsley's testimony is clearly analogous to the testimony we found troubling in Tung and which required a new trial. Beardsley was introduced to the jury as having years of experience conducting interrogations, creating an impression that he had a particular expertise in determining truth. His testimony, which clearly conveyed the impression to the jury that defendant was being deceptive during questioning, impermissibly colored the jury's assessment of defendant's credibility. In an effort to neutralize the negative effects of the objectionable testimony, the judge provided a firm and timely curative instruction sua sponte. Our Supreme Court "has consistently stressed the importance of immediacy and specificity when trial judges provide curative instructions to alleviate potential prejudice to a defendant from inadmissible evidence that has seeped into a trial." State v. Vallejo, 198 N.J. 122, 135 (2009).

However, "[e]vidence that bears directly on the ultimate issue before the jury may be less suitable to curative or limiting instructions than evidence that

20                                                                 A-5254-17T1

is indirect that requires additional logical linkages." State v. Herbert, 457 N.J. Super. 490, 505 (App. Div. 2019). Further, "[t]he adequacy of a curative instruction necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." State v. Winter, 96 N.J. 640, 647 (1984). Additionally, when there are numerous errors, "a single curative instruction may not be sufficient to cure the prejudice arising from cumulative errors at trial." Vallejo, 198 N.J. at 136 (citing State v. Frost, 158 N.J. 76, 86-87 (1999)).

Here, we find that the challenged testimony constituted plain error, and the single curative instruction was insufficient to cure the prejudice arising from Beardsley's reiteration of his impression that defendant was being deceptive during questioning following the judge's curative instruction. Undoubtedly, the jury's evaluation of whether defendant's denial of guilt was credible was tainted by Beardsley's "clearly and repeatedly stated opinion" that defendant was being deceptive in his denials. Tung, 460 N.J. Super. at 103. That taint was "clearly capable of producing an unjust result." R. 2:10-2.

In State v. Pasterick, 285 N.J. Super. 607, 620 (App. Div. 1995), we noted that "[t]here is no provision in our legal system for a 'truth-teller' who is authorized to advise the jury on the basis of ex parte investigations what the facts are and that the defendant's story is a lie." In Pasterick, the defendant

21

was convicted of purposeful and knowing murder in connection with the fatal stabbing of his father following a physical altercation. Id. at 609-10. At trial, the defendant testified that his father possessed the knife "throughout the struggle," implying "that his father was wounded by accident." Id. at 612. The State presented the testimony of a psychiatrist as a rebuttal witness, who, among other things, "relate[d] what he had learned from other sources that contradicted defendant's version of the facts," and testified that he "simply [did] not feel the defendant's story could be taken at face value." Id. at 618-20.

Despite the lack of objection by defense counsel to the expert's testimony and "the trial judge interject[ing] an admonition to the jury" at the conclusion of the testimony that "the ultimate conclusion on . . . who to believe and who not to believe [was] up to [the jury]," id. at 620, we held that the testimony "was plain error because it deprived defendant of his right to a fair trial." Id. at 622 (citations omitted). We explained that "[a]lthough part of the substance of what [the expert] testified to had already been related to the jury," the "testimony acquainted the jury with other alleged instances of defendant's anger leading to violence, and . . . purported to analyze and discredit [defendant's] testimony." Ibid.

When applying the plain error doctrine to evidence that should have been excluded, "a reviewing court may consider whether, absent the evidence

admitted in error, there was overwhelming evidence of the defendant's guilt." Tung, 460 N.J. Super. at 98-99. This case was a pitched credibility battle between S.H. and defendant on the pivotal issue of whether defendant sexually assaulted S.H. We recognize that defendant ultimately made incriminating admissions during the interrogation.[12] However, the defense strategy was to repudiate the veracity of those admissions. Indeed, in summation, defense counsel commented that throughout the interrogation, he "had counted . . . close to [twenty] times where [defendant] said . . . it didn't happen." He stated that defendant's "definition of inappropriate touching [was] not the same as the . . . [interrogating officers']," who even acknowledged that lying "in bed with [S.H.] . . . with clothes on" was "not even against the law," but "[y]et they continued to badger," "hammer," "pressure[,] and hound[]" defendant.

In such a contentious dispute, "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal." Frisby, 174 N.J. at 596. The error here was exacerbated by the fact that, unlike Tung, the jury charge did not "include[] a general instruction to disregard the officers' 'comments' during defendant's interrogation," in order

---

[12] We appreciate the natural desire of an experienced detective to explain his interrogation techniques and his interactions with a suspect. However, such an explanation cannot cross over the line of inadmissible lay opinion about a defendant's credibility.

"to address the multiplicity of times" during the interrogation when the officers accused defendant of not being honest or truthful in his denials. Id. at 102. The error was further compounded by the other two issues raised by defendant for the first time on appeal, which we now address.

## III.

In Point II, defendant argues the testimony of S.H.'s sister-in-law, V.H., regarding S.H.'s disclosure of the abuse to her "sixteen years after the abuse ended," was "inadmissible hearsay." Defendant also contends that V.H.'s testimony that S.H.'s disclosure "confirmed [V.H.'s] intuition about defendant" and validated "the weird vibes [V.H. had] gotten" from defendant had the effect of "bolster[ing] the victim's credibility[,] . . . improperly substantiat[ing] the allegation of abuse," and "inject[ing] inferential propensity evidence" into the case.

V.H. testified about the "cold and awkward" nature of the relationship between defendant and S.H., S.H's 2011 disclosure to her of defendant's sexual abuse, her subsequent meeting with defendant and the family during which defendant made incriminating statements, and her "intuition" concerning defendant. As to the latter, during her direct examination, V.H. testified about S.H.'s disclosure to her and her husband as follows:

> [PROSECUTOR]: And what was [S.H.'s] demeanor like as she was making this disclosure to you?

[V.H.]: She was very nervous when she first started, and she had told us that she hadn't told many people, so, to me, that explained why she was nervous at first. But then, as she began to continue with the story, I openly said, whoa, I knew it.  And then she calmed down and started to talk to us a little more. . . .

[PROSECUTOR]: And why would [you] say "I knew it"?

[V.H.]: I just always had weird vibes, . . . we lived with [defendant] when we first got married, and I would not go out in the living room with just my pajamas on, and if I did for some reason, like me and my husband were going to sit down on the couch, I would immediately sit down and cover up with a blanket.  Like I just did not feel comfortable in any situation.

[PROSECUTOR]: And who made you feel uncomfortable?

[V.H.]: [Defendant].

[PROSECUTOR]: Did he do anything to make you feel uncomfortable?

[V.H.]: In the beginning, no.  At one point, there was a very oddly exchanged hug.  That point on, I did feel like, okay, well, now all the weird vibes I've gotten have just been confirmed.  But it was mainly just my intuition.

A-5254-17T1

Generally, hearsay is an out-of-court statement admitted "to prove the truth of the matter asserted," N.J.R.E. 801(c),[13] and, subject to limited exceptions, is inadmissible. N.J.R.E. 802. Ordinarily, a third party's testimony about a victim's out-of-court description of an alleged sexual assault is inadmissible hearsay evidence. Ibid. However, the fresh-complaint doctrine is a common law exception to this rule that "allows witnesses in a criminal trial to testify to a victim's complaint of sexual assault." State v. Hill, 121 N.J. 150, 151 (1990). See State v. W.B., 205 N.J. 588, 616 n.14 (2011). The purpose of the doctrine is to "allow[] the admission of evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015) (citing Hill, 121 N.J. at 163). Notably, such evidence is not admissible to prove any substantive element of the offense or to "bolster the victim's credibility." State v. Bethune, 121 N.J. 137, 148 (1990).

"[T]o qualify as fresh-complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, to a person the victim would ordinarily turn to for support."

[13] While several of the New Jersey Rules of Evidence have since been amended, for purposes of this opinion, the Rules cited will be those in force during the time of the trial in 2017.

R.K., 220 N.J. at 455 (citing W.B., 205 N.J. at 616). The requirement that a sexual assault be reported in a reasonable time is applied more flexibly in cases where the declarant is a child at the time of the alleged abuse. W.B., 205 N.J. at 618 (citing State v. L.P., 352 N.J. Super. 369, 382 (App. Div. 2002)). "The determination whether the fresh complaint rule's conditions of admissibility have been satisfied is committed to the discretion of the trial court." L.P., 352 N.J. Super. at 380-81 (citing Hill, 121 N.J. at 167-68). An abuse of discretion may be found if the trial court made a "clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (citation omitted).

Because defendant failed to object to V.H.'s testimony at trial, we review the admissibility of her testimony under the plain error standard. R. 2:10-2. Although "a substantial lapse of time between the assault and the complaint may be permissible if satisfactorily explainable by the age of the victim and the circumstances surrounding the making of the complaint," State v. Pillar, 359 N.J. Super. 249, 281-82 (App. Div. 2003), we agree with defendant that a sixteen-year delay in the circumstances of this case was not fresh by any measure. See id. at 285 (finding inadmissible as "fresh complaint" statements made "six years" after the abuse).

Assuming we accept the State's contention that the disclosure to V.H. "was not . . . hearsay" because it was not introduced "for the truth of the matter

asserted, but rather for its effect on the listener," even more troubling was V.H.'s testimony that the sexual abuse disclosure confirmed her "intuition" about defendant. To be sure, such lay opinion testimony had the undoubted effect of bolstering S.H.'s credibility and implicating defendant's guilt by necessary inference. However, just as fresh complaint is not admissible to bolster the victim's credibility, Bethune, 121 N.J. at 148, "the lay opinion rule" does not authorize a witness to "express a view on the ultimate question of guilt," McLean, 205 N.J. at 461, and prohibits the "assessment of another witness's credibility." Frisby, 174 N.J. at 594.

Indeed, in disapproving of a witness "express[ing] an opinion of defendant's guilt," our Supreme Court has observed:

> We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.
>
> [Id. at 594 (quoting State v. Hightower, 120 N.J. 378, 427-28 (1990)).]

Even if the testimony does not constitute reversible error on its own, equally problematic was V.H.'s testimony that S.H.'s disclosure "confirmed" the "weird vibes" she had always "gotten" from defendant. By connecting S.H.'s disclosure to defendant's "weird vibes" and elaborating that the "weird vibes" stemmed from specific instances where she felt "uncomfortable" around defendant as well as "a very oddly exchanged hug," V.H. implied that defendant had a trait of character associated with proclivities for sexual misconduct.

"Because an individual's testimony regarding another person's character trait is a form of lay opinion evidence, N.J.R.E. 701 determines its admissibility." Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 310 (2006). Inasmuch as V.H.'s testimony was "rationally based on [her] perception" and would "assist in understanding [her] testimony or in determining a fact in issue," her lay opinion passes muster under the threshold requirements of Rule 701. See Fitzgerald, 186 N.J. at 309 ("An opinion witness offers a personal assessment of a prior witness' character based on his or her own perceptions.").

More difficult, however, is the determination as to whether V.H.'s testimony was permissible under N.J.R.E. 404.[14]

Under Rule 404(a)(1), "[e]vidence of a person's character or character trait . . . is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion" except when "offered by the accused . . . or by the prosecution to rebut the same." "[T]he Rule requires that the character trait evinced by the evidence must be one 'pertinent' to the issues in the case." State v. Abril, 444 N.J. Super. 553, 560 (App. Div. 2016). To that end, pertinent evidence "must relate to a character trait directly involved and apply to a relevant time and place in the defendant's life." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 404(a)(1) (2019) (citations omitted).

Under Rule 404(b), "[e]xcept as otherwise provided by Rule 608(b)[15] evidence of other crimes, wrongs, or acts is not admissible to prove the

_____

[14] We note the adoption of subsequent amendments to the rule, none of which substantively impact this case. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, N.J.R.E. 404, www.gannlaw.com (2020).

[15] N.J.R.E. 608(b) permits an attack on "[t]he credibility of a witness in a criminal case" in limited circumstances that do not apply here. Additionally, under N.J.R.E. 608(a), "[t]he credibility of a witness may be attacked . . . by evidence in the form of opinion . . . provided, however, that the evidence relates only to the witness' character for truthfulness or untruthfulness," not sexual proclivities as here.

disposition of a person in order to show that such person acted in conformity therewith." Because of the "underlying danger" that a "jury may convict the defendant because he is a 'bad' person in general," State v. Skinner, 218 N.J. 496, 514 (2014) (quoting State v. Cofield, 127 N.J. 328, 336 (1992)), "[t]o be admissible, such evidence must be 'relevant to a material issue,' and its probative value 'must not be outweighed by its apparent prejudice.'" State v. Sanchez-Medina, 231 N.J. 452, 465 (2018) (quoting Cofield, 127 N.J. at 338). "The mere bolstering of a witness's credibility does not satisfy the relevancy element of the Cofield test." State v. Prall, 231 N.J. 567, 582 (2018).

Applying these principles, we are convinced that introducing testimony of defendant's "weird vibes" served no purpose other than casting defendant's character in a negative light, from which the jurors could infer that defendant was more likely to have sexually assaulted S.H. This is the exact type of propensity inference that Rule 404 was designed to avoid. Although V.H.'s feelings do not constitute "other crimes, wrongs, or acts" prohibited under Rule 404(b), the specific instances she cited as forming the basis for her opinion about a particular trait of defendant's character had the import of showing that "on a particular occasion" defendant "acted in conformity therewith." N.J.R.E. 404(a).

The State counters that the testimony was permissible under Rule 404(a)(1) and 405 to rebut defendant's evidence of good character. However, Rule 404(a)(1) "prohibits the admission of character evidence by a prosecutor as circumstantial proof of an accused's propensity toward the conduct charged unless the accused 'opens the door' to such evidence by offering evidence of his or her pertinent good character traits." State v. Baluch, 341 N.J. Super. 141, 188 (App. Div. 2001) (quoting State v. Hunt, 115 N.J. 330, 369 (1989)). When V.H. testified during the State's case-in-chief, no evidence of good character had been introduced by defendant.

Additionally, Rule 405 provides that "[s]pecific instances of conduct not the subject of a conviction of a crime shall be inadmissible [to prove a trait of character]," unless "character or a trait of character . . . is an essential element of a charge, claim, or defense," none of which apply here. N.J.R.E. 405(a) and (b). See State v. Scott, 229 N.J. 469, 496 (2017) (Albin, J., concurring) (explaining that under Rule 405(b), "specific instances of conduct are admissible when a party's character for truthfulness is an essential element of a claim or defense . . . such as in a defamation case."); see also Johnson v. Dobrosky, 187 N.J. 594, 604 (2006) ("The obvious corollary of [Rule 405's] limited rule of admissibility is that evidence of a person's character or a trait thereof is not admissible when it is not an element of a claim or defense.").

32

Character evidence is restricted under our evidence rules because it tends to be highly prejudicial. "That limitation reflects the danger inherent in the introduction of such evidence—'its susceptibility to convert a trial of the issue to a judgment of the person.'" Johnson, 187 N.J. at 604 (quoting State v. Burke, 354 N.J. Super. 97, 109 (Law Div. 2002)). "[R]elevant evidence may also be excluded on the ground that 'its probative value is substantially outweighed by the risk of . . . undue prejudice.'" Scott, 229 N.J. at 481 (quoting N.J.R.E. 403). Even if otherwise admissible, we are satisfied that under the circumstances of this case, V.H.'s "intuition" combined with defendant's "weird vibes" unduly prejudiced the defense. Although any single trial error may not warrant a reversal, the cumulative effect of several errors may operate to deny defendant a fair trial. State v. Jenewicz, 193 N.J. 440, 473 (2008). We find that this error, in conjunction with the other errors, was "clearly capable of producing an unjust result." R. 2:10-2.

## IV.

In Point III, defendant argues the prosecutor violated "[t]he rules of evidence prohibit[ing] the impeachment of a defendant's character witness with specific instances of conduct" by cross-examining each of defendant's character witnesses with "the conduct for which defendant was on trial." During cross-examination, the prosecuting attorney asked each of defendant's

33

character witnesses whether his or her opinion of defendant would change if he or she knew that defendant admitted to law enforcement that he inappropriately touched his daughter. Defendant contends that although the witnesses responded in the negative, by "[c]onfronting the witnesses with the allegations against defendant," the State "presupposed his guilt and treated the issue in dispute as a foregone conclusion." Further, "because the State's proof[s] were not overwhelming and . . . defendant's statement was disputed at trial, the prosecutor's improper cross-examination of the character witnesses denied defendant his right to a fair trial."

"N.J.R.E. 608 places limitations on impairment of the credibility of a defendant's character witness in a criminal proceeding. Inquiry may not be made into the witness's knowledge of the defendant's alleged criminal conduct which is not evidenced by a criminal conviction." Abril, 444 N.J. Super. at 561-62 (quoting Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 5 on N.J.R.E. 607 (2015)). Likewise, both Rule 405, outlining the means by which admissible character evidence may be proven, and Rule 607, delineating the proper methods for impeaching a witness's credibility, prohibit a prosecutor from impeaching "the credibility of a defendant's character witness by inquiring into the witness's knowledge of alleged criminal misconduct not evidenced by a criminal conviction." Id. at 561.

As our Supreme Court explained in <u>Scott</u>, Rule 608 "preclude[s] the use of specific instances of conduct to attack the credibility of a witness."  229 N.J. at 481.  Indeed, Rule 608 imposes a complete ban on the use of specific instances of conduct and "bars not only the use of extrinsic evidence but also cross-examination into specific instances of misconduct."  <u>Id.</u> at 488 (Rabner, C.J., concurring).[16]

Because defendant did not object to the cross-examination challenged here for the first time on appeal, we again review defendant's arguments through the prism of the plain error standard.  We agree that the objectionable questioning was a clear violation of Rule 608 and 405 and constituted plain error in the circumstances of this case.  We find that it was fundamentally unfair to impeach defendant's character witnesses by cross-examining them on defendant's alleged incriminating statement that was not the subject of a criminal conviction and the veracity of which was challenged during the trial.

In weighing the effect of improperly admitted evidence to determine whether its admission constitutes plain error, we must of necessity assess whether "the State's case is particularly strong."  <u>R.K.</u>, 220 N.J. at 456.  This

---

[16] N.J.R.E. 608 was amended in July 2020, in response to the Supreme Court's ruling in <u>Scott</u>.  Biunno, Weissbard, & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. on N.J.R.E. 608, www.gannlaw.com (2020).  However, we apply the iteration of the rule that existed when the case was tried.

case involved a question of guilt dependent entirely on the jurors' resolution of who was telling the truth. We believe that this error, either in isolation or in combination with the other errors in this trial, requires reversal of defendant's convictions. R. 2:10-2. We therefore are compelled to reverse defendant's convictions and remand for a new trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5254-17T1